In re Disbarment Proceedings Against JOHN G. PARKINSON, SR.— 128 S. W. (2d) 1023.

Court en Banc, June 6, 1939.

716

*Frank Hollingsworth, William H. Becker, Lester G. Seacat* and *E. W. Jones* for informants.

*James A. Reed* and *Robert Ingraham* for respondent.

PER CURIAM:—This is an original proceeding, instituted by leave, on the information of the General Chairman of Bar Committees, and the Advisory Committee to said General Chairman (under rule·No. 36 of this court), charging John G. Parkinson, Sr. (who will hereinafter be referred to as respondent), a licensed and practicing attorney at St. Joseph, with professional misconduct, the object of which is to revoke his license as an attorney, and to forever disbar him. The information is in seven counts, the first four of which charge specific acts of professional misconduct; whereas the remaining three are general in character. The fourth count is no longer involved, as the committee offered no evidence in support of the charge therein contained. Omitting formal portions, and the fourth count in its entirety, the charging parts of said information are as follows:

"I. That the accused John G. Parkinson, Sr., on or about the —— day of May, 1933, entered into a conspiracy, combination, confederation and agreement with one Oscar Payne and Eva Bessie Hinkle Ramseir (formerly Eva Bessie Hinkle) to cheat and defraud the St. Joseph Railway, Light, Heat & Power Company in this, to-wit: That the said Eva Bessie Hinkle Ramseir, who had prior to May 10th, 1933, submitted herself to an illegal operation for the purpose of causing an abortion and which said abortion was then impending, would ride as a passenger·upon a bus operated by said company in the City, of St. Joseph, Missouri, and designedly fall while upon the same and make it falsely appear that the miscarriage resulting from said illegal operation was caused by the negligence of said company in operating the bus, and that thereafter the said John G. Parkinson, Sr., in his capacity as a lawyer, would assert and file

a claim or suit or both against said company falsely claiming and alleging that said miscarriage was caused by the negligence of said company in the operation of said bus, and that in the assertion and prosecution of said claim and suit the said Eva Bessie Hinkle Ramseir would falsely testify that her miscarriage was caused and produced by the negligence of said company in the operation of its bus; that pursuant to said conspiracy, scheme and plan aforesaid, Eva Bessie Hinkle Ramseir, on or about May 10th, 1933, did enter and ride upon a bus of said company operated in the City of St. Joseph and did designedly fall while riding thereon in such a manner as to make it appear that said fall was caused by the negligent operation of said bus, following which said fall said Payne and her husband transported her in an automobile from the scene of the fall to the entrance of a rock quarry where she was let out by said Payne and walked home and went to bed and called a physician (not a party to the conspiracy) and shortly thereafter did suffer a miscarriage; and that thereafter in further pursuance of said conspiracy, plan and scheme, the accused and said Payne called at her .home and there procured the execution of a contract employing the accused as her attorney to represent her in the presentation and prosecution of said false claim for damages against said company, agreeing to pay the accused fifty per cent of any amount recovered on said false claim; and that the accused, in further pursuance of said conspiracy, plan and scheme, did make a claim and file suit against said company for damages falsely claiming and charging that the miscarriage resulted from the negligence of said company in the operation of said bus; and that thereafter the said Eva Bessie Hinkle Ramseir, having been subpoenaed by said company to give her deposition in said cause, was told and directed by said Payne, in further pursuance of said conspiracy, plan and scheme, to go to the office of accused and discussed with accused the testimony that she would give in said deposition; and that on or about August 4, 1933, the said Eva Bessie Hinkle Ramseir went to the office of the accused, where the accused, in further pursuance of said conspiracy, plan and scheme, did advise her to testify in her deposition that she had boarded said bus for the purpose .of locating a house for her mother and to testify that the bus stopped suddenly causing her to fall, and to testify that the miscarriage happened as a result of the fall, and that she did not know who had transported her from the scene of the fall, all of which said proposed testimony was false and by the accused known to be false at the time; and that thereafter the said Eva Bessie Hinkle Ramseir did appear and give her deposition, whereat she testified falsely as aforesaid and as directed to do by the accused; and that thereafter, in further pursuance of the aforesaid conspiracy, plan and scheme, and as a result of the making of said false claim and the suit filed thereon and the false testimony given in the deposition as

aforesaid, the accused effected a compromise of the suit for the sum of Seven Hundred Fifty Dollars, thereby defrauding said Bus Company of said sum of Seven Hundred. Fifty Dollars, and thereafter in the division of the proceeds of said settlement among the accused and his co-conspirators paid to the said Eva Bessie Hinkle Ramseir the sum of Fifty Dollars.

"II. That the accused John G. Parkinson, Sr., on or about the 31st day of July, 1933, entered into a conspiracy, combination, confederation and agreement with Dr. Blanche Rennick, Oscar Payne, George W. Barker, Minnie B. Jeffers and Ross Cox to cheat and defraud an Automobile Liability Insurance Company, in this, to-wit: That the said Minnie B. Jeffers, after submitting to an illegal operation performed by Dr. Blanche Rennick for the purpose of producing an abortion and while the miscarriage to result therefrom was impending, would participate in a faked and pretended automobile accident from which it would be made to appear that the miscarriage resulting from said illegal operation was caused by the unintentional negligence of one George W. Barker who then had, or would procure, a contract of automobile liability insurance indemnifying him against loss or damage resulting from unintentional negligence in the operation of the automobile covered thereby, and thereafter the said Minnie B. Jeffers, through the accused as her attorney, would make a false and fraudulent claim against said Barker for the purpose of collecting damages from his insurer upon the false claim that her miscarriage was caused and produced by the unintentional negligence of said Barker in the operation of an automobile covered by the contract of liability insurance hereinbefore mentioned, which said policy of insurance was procured by the said George W. Barker with the knowledge of the accused and in pursuance of the conspiracy aforesaid for the purpose of defrauding said insurer by faking an accident as aforesaid; and that thereafter, pursuant to said conspiracy, scheme and plan as aforesaid, it was agreed that the said Minnie B. Jeffers would station herself at or near a street intersection in the City of St. Joseph, Missouri, with the understanding and agreement with the accused and his aforesaid co-conspirators that said Barker would drive the automobile covered by the policy of insurance aforesaid in such a manner as to make it appear to strike the said Minnie B. Jeffers through unintentional negligence on his part, and that she would thereupon fall to the ground and scream and pretend to be injured; that in further pursuance of said conspiracy, plan and scheme the said Minnie B. Jeffers and said Payne went to a point near the scene of the proposed accident, where they met said Cox, and there discussed and confirmed the arrangements and details for the staging of said pretended accident; and that in further pursuance of said conspiracy, plan and scheme as aforesaid

the said Minnie B. Jeffers, on or about August 31, 1933, did station herself at or near the intersection agreed upon, whereupon the said Barker driving his automobile in such a manner as to pretend avoiding an automobile then and there being driven by Oscar Payne in an opposite direction, as prearranged, did drive the same against said Minnie B. Jeffers pretending that the striking of her was the result of unintentional negligence on his part, whereupon the said Minnie B. Jeffers fell to the ground and screamed, following which she was transported to her mother's home in St. Joseph, Missouri by said Barker in his automobile, where said Barker, by prearrangement between the aforesaid co-conspirators, gave her, in the presence of another person, his name and address and made admissions that his automobile was heavily insured and that the striking of her was due to his negligence; that in further pursuance of said conspiracy, plan and scheme a physician (not a party to the conspiracy) was called to attend the said Minnie B. Jeffers and she shortly thereafter suffered a miscarriage; that in further pursuance of said conspiracy, plan and scheme, and after she had suffered the miscarriage aforesaid, the accused, in company with said Payne, called upon her and procured from her a contract employing the accused to represent her in the prosecution of said false claim against the said Barker and his insurer; in which contract she agreed to pay the accused seventy-five per cent of any and all amounts recovered in the prosecution of said false claim, and out of which seventy-five per cent the accused was to pay said Barker twenty-five per cent, retain twenty-five per cent for himself and distribute the remaining twenty-five per cent among the aforesaid co-conspirators, Rennick, Cox, Payne, and certain other witnesses designedly placed near the scene of said pretended accident by the co-conspirators; that following the making of said contract, the accused, in further pursuance of said conspiracy, plan and scheme as aforesaid, did make claim and file suit against the said Barker for damages to said Minnie B. Jeffers, falsely claiming and charging that her miscarriage was produced by the unintentional negligence of the said Barker in the operation of his automobile; that thereafter the said Minnie B. Jeffers was called upon to give her deposition in the aforesaid suit and, before the giving of said deposition, the accused, in further pursuance of the aforesaid conspiracy, scheme and plan, directed the said Minnie B. Jeffers to falsely testify that she had never seen Oscar Payne either before or since the accident and that she did not know the driver of the car who had pretended to force Barker's car to hit her, did not know what kind of car it was and could not describe it, and that the pretended accident was caused by the unintentional negligence of the said Barker; that in further pursuance of said conspiracy, plan and scheme as aforesaid, the said Minnie B. Jeffers did give her deposition falsely testifying as directed by the accused;

and that thereafter in further pursuance of the conspiracy, plan and scheme, the said Minnie B. Jeffers, in company with her husband, came to the City of St. Joseph to participate in the trial of the suit so instituted by the accused as aforesaid; and that the husband of said Minnie B. Jeffers having recently learned of the plan and scheme to defraud said Insurance Company, demanded of the accused that said suit be dismissed, whereupon the accused assured the said Minnie B. Jeffers and her husband that said suit would or could be speedily compromised, and the same was compromised, for the sum of Fifteen Hundred Dollars, of which said sum the accused paid to the said Minnie B. Jeffers One Hundred Thirty-Five Dollars in addition to Sixty-Five Dollars in cash which had previously been advanced by the accused to the said Minnie B. Jeffers and disbursed a part of the remainder thereof to the other co-conspirators.

"III. That the accused John G. Parkinson, Sr., on or about the 26th day of March, 1935, entered into a conspiracy, combination, confederation and agreement with Oscar Payne, Lloyd Webb, Norman Fisher, Ross Cox, Lulu Webb and Eva Haynes to cheat and defraud Gertrude Hahn and James Hahn, doing business as 'Sterling Cleaners' and their automobile liability insurer in this, to-wit: That the said Lloyd Webb, Lulu Webb and Eva Haynes would station themselves at a designated point on a street in St. Joseph, Missouri, and that the said Norman Fisher, who was a servant, employee and truck driver for Gertrude Hahn and James Hahn, doing business as Sterling Cleaners, would drive one of the trucks operated by him for Sterling Cleaners in such a manner as to appear to strike the said Lloyd Webb, Lulu Webb and Eva Haynes as a result of his unintentional negligence in the operation of said truck, and that he would appear to drive the truck onto and against the said Lloyd Webb, Lulu Webb and Eva Haynes while pretending to avoid another motor vehicle which would be driven at the same point by the said Ross Cox, and that the said Lloyd Webb, Lulu Webb and Eva Haynes would pretend to be seriously injured by reason of the pretended unintentional negligence of the said Norman Fisher, and thereafter the said Lloyd Webb, Lulu Webb and Eva Haynes would employ the accused as their attorney and would through him make a false and fraudulent claim against the said Gertrude Hahn and James Hahn, doing business as Sterling Cleaners, and the insurer for the purpose of collecting damages from them and their insurer upon the false claim that their pretended serious injuries were caused and produced by the unintentional negligence of the said Norman Fisher while acting as a servant and employee of the said Gertrude Hahn and James Hahn, and if necessary to enforce recovery from said false claim, the accused would in the name of said Lulu Webb, Lloyd Webb and Eva Haynes file fraudulent suits falsely charging and

alleging that the claimants had sustained serious personal injuries as the result of the unintentional negligence of the said Norman Fisher; and thereafter, pursuant to said conspiracy, scheme and plan as aforesaid, the said Lloyd Webb, Lulu Webb and Eva Haynes did, on or about the 27th day of March, 1935, station themselves on the street in the City of St. Joseph, as agreed, with the understanding and agreement with the accused and his aforesaid co-conspirators that the said Fisher would drive the truck of Sterling Cleaners in such a manner as to make it appear to strike and seriously injure the said Lulu Webb, Lloyd Webb and Eva Haynes through unintentional negligence on the part of the said Norman Fisher while pretending to avoid another motor vehicle which would then and there be driven by the said Ross Cox; that in further pursuance of said conspiracy, plan and scheme, the said Norman Fisher went to a point near the scene of the proposed accident where he met the said Cox and there discussed and confirmed the arrangements and details for the staging of said pretended accident; and that in further pursuance of said conspiracy, plan and scheme as aforesaid, the said Norman Fisher did drive his truck in such a manner as to pretend to avoid an automobile then and there driven by Ross Cox in an opposite direction, as prearranged, and did drive the same against the said Lulu Webb, Lloyd Webb and Eva Haynes pretending that the striking of them was the result of unintentional negligence on his part, whereupon the said Lloyd Webb, Lulu Webb and Eva Haynes fell to the ground, screamed and pretended to be seriously injured, following which they were transported to the home of the Webbs in Elwood, Kansas, by a stranger to the conspiracy in whose presence the said Norman Fisher furnished his name and address and made admissions that the striking of the said Lulu Webb, Lloyd Webb and Eva Haynes was due to his unintentional negligence; thereafter, in further pursuance of the conspiracy, plan and scheme, a physician was called to attend the said Lulu Webb and Lloyd Webb and a physician was also called to attend the said Eva Haynes at which time the said Lulu Webb and Lloyd Webb and the said Eva Haynes pretended to have sustained serious personal injuries; that thereafter, and in further pursuance of the conspiracy, plan and scheme, the said Payne and said Cox called upon the said Lulu Webb, Lloyd Webb and Eva Haynes in an automobile belonging to the accused and transported all of them to the office of the accused where a formal contract for the employment of accused was signed; and in further pursuance of the conspiracy, plan and scheme, the accused did undertake to make the false claim on behalf of Lulu Webb, Lloyd Webb and Eva Haynes against the said James Hahn and Gertrude Hahn, doing business as Sterling Cleaners, and their insurer, and the accused did thereafter advance money to the said Lulu Webb and Lloyd Webb, and thereafter the accused did cause

the said Lloyd Webb to be brought to his office by said Payne and advised said Lloyd Webb that someone was talking about the pretended and faked accident in which they had all participated and discussed the formation of a plan to prevent said person, whom he identified, from revealing the circumstances of said faked and pretended accident within their knowledge.

"V. That the accused for more than ten years, and continuously thence hitherto, has been, and is now, engaged in the unprofessional and unethical practice of law and has carried on a general law practice in an unethical and unprofessional manner by unprofessionally, unethically and unlawfully accepting employment as an attorney in the course of his law practice to initiate and assert fictitious and fraudulent claims and by initiating and instituting fraudulent suits for and in behalf of many persons for alleged personal injuries who, at the time of such employment or of such initiation and assertion of claims, or initiation and institution of suits, had no injury reasonably attributable to the cause or causes alleged by the accused in behalf of such persons to have caused the injuries in the claim or suits so initiated, asserted or instituted by the accused, when the accused knew, or had good reason to believe, that said persons for whom said claims were initiated and asserted, or suits initiated and instituted, had no injury reasonably attributable to the cause or causes alleged, among which such persons are the following: Eva Bessie Hinkle Ramseir, Minnie B. Jeffers, Virgie Kennedy, Allden Kennedy, Lulu Webb, Lloyd Webb and Eva Haynes.

"VI. That the accused for more than ten years past, and continuously thence hitherto, has been engaged, and does now engage, in the unprofessional and unethical practice of law and carries on a general law practice by unprofessionally, unethically and unlawfully dividing fees, agreeing to divide fees, and participating and aiding in the division of fees which he received or expected to receive in the conduct of his law practice with persons who were not lawyers, among which such persons are the following: Oscar Payne, Ross Cox and Blanche Rennick.

"VII. That the accused for ten years past, and continuously thence hitherto, has engaged, and does now engage, in the unprofessional and unethical practice of law and carries on a general law practice in an unethical and unprofessional manner by unprofessionally, unethically and unlawfully procuring, employing and using agents and runners, as a part of and in furtherance of his law practice, for the purpose of soliciting, enticing, inducing and persuading many persons to employ him as their attorney to initiate and assert

claims and initiate and institute suits for and in behalf of such persons against persons, firms and corporations, which agents and runners the accused did agree to pay or reward and which said agents and runners the accused did pay and reward for the services so rendered by them as aforesaid, among which said agents and runners so employed and used by the accused were the following: Oscar Payne, Ross Cox and Blanche Rennick.''

Respondent filed an answer which, omitting count four, in words and figures, is as follows:

''Comes now John G. Parkinson, Sr., and states that he was at all times mentioned in said information and is now a member of the Bar of the State of Missouri, and is and was at all such times a duly licensed attorney at law, admitted to practice the profession of law in and before all the courts of the State of Missouri, including the Supreme Court thereof, and as such was and is engaged at all times in said information mentioned in the practice of his profession throughout the State of Missouri as a member of the law firm of Mytton, Parkinson and Morris, and is and was at all such times a resident of and maintained a law office in the city of St. Joseph, Missouri.

''*COUNT I.* Said John G. Parkinson, Sr., in answer to Count I of said information alleges the fact to be that Mrs. Eva Hinkle, then Mrs. Russell Hinkle and now stated to be Eva Bessie Hinkle Ramseir employed the firm of Mytton, Parkinson and Morris to settle a claim or institute a suit in her behalf against the St. Joseph Railway, Light, Heat & Power Company for injuries sustained by her due to the negligence of the employees of said company while she was a passenger upon one of the Company's cars or busses, and to compromise or prosecute said suit; that by the terms of said contract she was to receive one-half and the firm of Mytton, Parkinson and Norris one-half of any sum realized as a result of said suit; that pursuant to the terms of said contract said suit was brought and instituted against said street car company in behalf of said Mrs. Eva Hinkle, and thereafter she gave her deposition in said cause, and thereafter her said cause against said St. Joseph Railway, Light Heat & Power Company was settled, and the proceeds thereof distributed according to the terms of said contract of employment and in the manner as by her directed. That said John G. Parkinson, Sr., did not know, had never seen, nor had he ever heard of said Mrs. Eva Bessie Hinkle prior to the signing of the contract of employment, which was a short time after her accident; that at no time did he advise her to testify other than the truth; that he did not advise her to testify in her deposition that she boarded said bus for the purpose of locating a house for her mother or for any other purpose, and that he did not advise her to testify that the bus stopped suddenly causing her to fall, or that she did not know who

had transported her from the scene of the fall; that said John G. Parkinson, Sr., did not at any time know or even suspect that Mrs. Hinkle's claim or cause of action against said Street Car Company was other than a *bona fide* case, and knows nothing of any fraud or claim of fraud connected with said claim, except such as is based upon the affidavits and evidence received by the Bar Committee, and the injuries asserted in said claim and suit were from information received from Mrs. Eva Hinkle; that said Oscar Payne, so far as the said John G. Parkinson, Sr., knew, had no interest, financial or otherwise, direct or indirect, in said cause of action and claim of Mrs. Hinkle.

"Said John G. Parkinson, Sr., expressly alleges that he at no time entered into a conspiracy with the said Oscar Payne and Eva Bessie Hinkle or any other person or persons to defraud said Street Car Company or to bring a false claim against said company or any other company or person, and denies expressly all of the allegations made in Count I of the information to the effect that he did enter into a combination and conspiracy as therein alleged, and specifically states that the only agreement he ever had with said Eva Bessie Hinkle was the contract of employment hereinbefore mentioned which said contract was made upon his part in good faith and in the firm belief that the said Eva Bessie Hinkle had been injured in the manner and form in the petition filed by said firm.

"Further answering, said John G. Parkinson, Sr., states that the charges in Count I filed by the Bar Committee were based upon the false affidavits and evidence produced by one Ross Jones on behalf of himself and his principal by improper methods and inducements in furtherance of a conspiracy to discredit and destroy the said John G. Parkinson, Sr., in his reputation and the practice of his profession.

"Further answering Count I of said information, said John G. Parkinson, Sr., denies each and every allegation therein contained except such as are hereinabove specifically admitted.

"*COUNT II.* In answer to Count II of said information, said John G. Parkinson, Sr., alleges the fact to be that the firm of Mytton, Parkinson and Norris was employed by Mrs. Minnie B. Jeffers to institute a suit in her behalf against one George W. Barker on account of injuries she claimed to have sustained by reason of being struck by a motor vehicle driven by one George W. Barker. That under the terms of said employment, Mrs. Jeffers was to receive one-half, and the law firm of Mytton, Parkinson and Norris one-half, of the proceeds realized from said suit or any settlement or compromise thereof. That pursuant to said contract of employment said suit was instituted and the facts recited in the petition filed were in exact accordance with the information furnished to said firm by the said Minnie B. Jeffers and were believed by said firm

and the said John G. Parkinson, Sr., to be true. That said case was filed in good faith and in the belief that said case was honest and meritorious.

"That thereafter the deposition of the said Minnie B. Jeffers was taken in said cause by the attorneys for the defendant, at which time and place said Minnie B. Jeffers testified to the truth of all of the substantial allegations in her said petition contained. Said John G. Parkinson, Sr., did not at any time or place suggest or advise said Minnie B. Jeffers to testify to any facts. That said case was thereafter settled and the proceeds distributed in accordance with the terms of said contract.

"Said John G. Parkinson, Sr., specifically denies that he ever saw, knew or heard of said Minnie B. Jeffers until a time immediately before the making of said contract of employment which was a short time after the accident referred to had occurred. He specifically denies that the ever saw, or knew, said George W. Barker, the defendant in said cause, prior to the time his deposition was taken in said cause which was several months after the accident complained of had occurred.

"Said John G. Parkinson, Sr., further alleges the fact to be that he never knew nor did he ever suspect the said Minnie B. Jeffers' claim was not founded in good faith and that he never knew that either Oscar Payne, Ross Cox, Dr. Blanche Rennick or any other person was directly or indirectly connected with or involved in said cause, and that he was not a party to any scheme, device or conspiracy between said parties or any other parties to make a false and pretended claim against said defendant Barker and that the first knowledge he had of any such conspiracy or any claim of such conspiracy was from the affidavits and testimony of said Barker and Jeffers which were procured by the said Ross Jones, and said John G. Parkinson, Sr., further asserts that he now believes that said affidavits were false and that no such conspiracy as is charged existed, but that in any event he was not a party to or knew of said conspiracy if one existed or to any other conspiracy, agreement or understanding to make a false claim against said Barker and to file a false and fraudulent lawsuit, or to cheat and defraud any liability insurance company.

"Further answering, said John G. Parkinson, Sr., states that the charges in Count II filed by the Bar Committee were based upon the false affidavits and evidence procured by one Ross Jones on behalf of himself and his principal by improper methods and inducements in furtherance of a conspiracy to discredit and destroy the said John G. Parkinson, Sr., in his reputation and the practice of his profession.

"Further answering, the said John G. Parkinson, Sr., denies each and every allegation in said Count II of said information contained, except such as are herein specifically admitted.

"*COUNT III.* Comes now John G. Parkinson, Sr., and in answer to Count III of said information alleges the fact to be that the law firm of Mytton, Parkinson and Norris was employed respectively by Lloyd Webb, Lulu Webb and Eva Haynes to collect damages from Gertrude Hahn and James Hahn doing business as the Sterling Cleaners on account of injuries sustained by each of them when struck by a motor vehicle or truck owned and operated by said defendant, Sterling Cleaners; that under the terms of said contracts the law firm of Mytton, Parkinson and Norris was to receive one-half and each of the other parties herein mentioned one-half of any sums realized as a result of their respective suits; that pursuant to the terms of said contracts said suits were instituted against said Sterling Cleaners, which said suits are now pending in the Circuit Court of Buchanan County, Missouri; that the allegations of said petitions were made in good faith and in accordance with the facts as stated by the plaintiff. That said John G. Parkinson, Sr., never knew or heard of the existence of one Norman Fisher prior to the time said Fisher's deposition was taken in said cause, which was several weeks after the accident occurred; that said John G. Parkinson, Sr., never knew of or heard of or learned of the existence of said Lloyd Webb, Lulu Webb or Eva Haynes prior to the date of the contract of employment, and never learned or knew of or suspected their respective claims, and each of them, were other than *bona fide* cases, and that the said John G. Parkinson, Sr., never knew or heard it stated or charged that Oscar Payne or Ross Cox, or either of them, or any other person, was directly or indirectly, financially or otherwise, interested in said suits, and knows nothing of any fraud or claim of fraud connected with said claims or suits except such as is based upon the affidavits and evidence received by the Bar Committee. Said John G. Parkinson, Sr., states the injuries asserted in said claims and suits were upon information received from Lloyd Webb, Lulu Webb and Eva Haynes, and he denies specifically that he ever entered into any conspiracy, combination or agreement with said Payne, the Webbs, Haynes, Fisher, Cox, or any other person, to cheat and defraud the said Hahns.

"Further answering, said John G. Parkinson, Sr., states that the charges in Count III filed by the Bar Committee were based upon the false affidavits and evidence procured by one Ross Jones on behalf of himself and his principal by improper methods and inducements in furtherance of a conspiracy to discredit and destroy the said John G. Parkinson, Sr., in his reputation and the practice of his profession.

"Further answering, said John G. Parkinson, Sr., denies each and every other allegation in said Count III of said information contained, except such as are herein specifically admitted.

"*COUNT V.* Comes now John G. Parkinson, Sr., and denies each and every allegation in said Count V of said information contained;

728

and alleges the fact to be that during the course of his law practice he has never knowingly instituted and initiated any fictitious and fraudulent claims of any kind or character, including the claims of Eva Bessie Hinkle Ramseir, Minnie B. Jeffers, Vergie Kennedy, Allden Kennedy, Lloyd Webb, Lulu Webb and Eva Haynes.

"Said John G. Parkinson, Sr., further states that said Count IV is insufficient to constitute any valid and legal charge against him in order to enable him to prepare to meet said alleged charges, and that said charges, therefore, should be disregarded and the said John G. Parkinson, Sr., be not required to answer thereto. That said John G. Parkinson, Sr., has heretofore filed in this Court a Motion to require said charges to be made more specific, definite and certain, or to be stricken out. That this Honorable Court has overruled said motion. Said John G. Parkinson, Sr., alleges that said charges are insufficient, indefinite and uncertain in that the name or names of the persons with whom it is charged conspiracies were entered into, the time when said conspiracies, acts and fraudulent claims were alleged to be made or committed, the times, places or circumstances under which said alleged practices or the names of the cases in which it is claimed or may be claimed said practices occurred, or the names of the persons who it is claimed or may be claimed were used to commit the improper acts and practices, are omitted, so that it is impossible for the said John G. Parkinson, Sr., to prepare and present a defense, or state any facts to this Court other than to generally deny said charges, all of which is in violation of the Constitution of the United States and specifically the Fourteenth Amendment thereto, and is in violation of the Constitution of the State of Missouri and the law of the land, and seeks to deprive the said John G. Parkinson, Sr., of his rights without due process of law and without affording him the equal protection of the law.

"COUNT VI. Comes now John G. Parkinson, Sr., and denies each and every allegation in said Count VI contained, and alleges the fact to be that he has never divided fees or agrees to divide fees with persons who are not lawyers, including said Oscar Payne, Ross Cox and Blanche Rennick.

"Said John G. Parkinson, Sr., further states that said Count VI is insufficient to constitute any valid and legal charge against him in order to enable him to prepare to meet said alleged charges, and that said charges, therefore, should be disregarded and the said John G. Parkinson, Sr., be not required to answer thereto. That said John G. Parkinson, Sr., has heretofore filed in this Court a Motion to require said charges to be made more specific, definite and certain, or to be stricken out. That this Honorable Court has overruled said motion. Said John G. Parkinson, Sr., alleges that said charges are insufficient, indefinite and uncertain in that the name or

names of the persons with whom it is charged conspiracies were entered into, the time when said conspiracies, acts and fraudulent claims were alleged to be made or committed, the times, places or circumstances under which said alleged practices or the names of the cases in which it is claimed or may be claimed said practices occurred, or the names of the persons who it is claimed or may be claimed were used to commit the improper acts and practices, are omitted, so that it is impossible for the said John G. Parkinson, Sr., to prepare and present a defense, or state any facts to this Court other than to generally deny said charges, all of which is in violation of the Constitution of the United States and specifically the Fourteenth Amendment thereto, and is in violation of the Constitution of the State of Missouri and the law of the land, and seeks to deprive the said John G. Parkinson, Sr., of his rights without due process of law and without affording him the equal protection of the law.

"*COUNT VII.* Comes now the said John G. Parkinson, Sr., and denies each and every allegation in said Count VII contained, and alleges the fact to be that he has not employed and used agents and runners in the furtherance of his said law practice for the purpose of soliciting, enticing, inducing and persuading persons to employ him as their attorney and denies specifically that he ever used said Oscar Payne, Ross Cox, and Dr. Blanche Rennick in such manner, or paid them for services in such capacity.

"Said John G. Parkinson, Sr., further states that said Count VII is insufficient to constitute any valid and legal charge against him in order to enable him to prepare to meet said alleged charges, and that said charges, therefore, should be disregarded and the said John G. Parkinson, Sr., be not required to answer thereto. That said John G. Parkinson, Sr., has heretofore filed in this Court a Motion to require said charges to be made more specific, definite and certain, or to be stricken out. That this Honorable Court has overruled said motion. Said John G. Parkinson, Sr., alleges that said charges are insufficient, indefinite and uncertain in that the name or names of the persons with whom it is charged conspiracies were entered into, the time when said conspiracies, acts and fraudulent claims were alleged to be made or committed, the times, places or circumstances under which said alleged practices or the names of the cases in which it is claimed or may be claimed said practices occurred, or the names of the persons who it is claimed or may be claimed were used to commit the improper acts and practices, are omitted, so that it is impossible for the said John G. Parkinson, Sr., to prepare and present a defense, or state any facts to this Court other than to generally deny said charges, all of which is in violation of the Constitution of the United States and specifically the Fourteenth Amendment thereto, and is in violation of the Constitution of the State of Missouri and the law of the land, and seeks to deprive the said John

G. Parkinson, Sr., of his rights without due process of law and without affording him the equal protection of the law.

"WHEREFORE in the premises John G. Parkinson, Sr., prays that the charges be dismissed, or in the event of failure so to order, that a commissioner be appointed to hear the evidence under rules of law and make findings of fact with recommendation and report to this Court."

Thereafter informants filed a motion for the appointment of a special commissioner, which was sustained, and Hon. Waldo Edwards, of the Macon County Bar, was appointed as such, to take the testimony and report his findings of facts and conclusions of law. Pursuant to such appointment, the commissioner heard the evidence, and in due time returned a transcript thereof to this court, which consisted of 981 pages. A substantially similar volume of testimony heard before the Advisory Committee at its several sittings was also returned to us with the commissioner's report, so that in arriving at our decision we have reviewed approximately two thousand pages of testimony. The informants' condensed narrative statement of the transcript of proceedings before the special commissioner alone exceeds three hundred pages. It is obviously impossible, within the bounds of this opinion, to give a resumé of the testimony of each witness, nor shall we attempt to do so.

The commissioner, upon the facts adduced, found "that the informants have failed to prove that the respondent is guilty of any of the charges contained in the information . . . and that respondent has exculpated himself," and recommended that the information be dismissed, and that the respondent be discharged. To the report, informants filed exceptions, and the cause was argued and submitted thereon. All questions as to the sufficiency of said exceptions have been waived, and the question for decision—the truth or falsity of the charges—is purely one of fact.

The charges in the first count will be referred to as the "Hinkle Case," the charges in the second count as the "Jeffers Case," and in the third count, the "Webb Case."

## THE HINKLE CASE

This involves the alleged conspiracy to defraud by having Eva Bessie Hinkle (now Ramseir) designedly fall, while a passenger on a bus, so as to make it appear that a miscarriage resulting from a prior illegal operation was caused by the negligence of the company in operating said bus.

The informants' case rests upon the testimony of Mrs. Hinkle which, stated in the light most favorable to the informants, was to the effect that in May, 1933, she had undergone an illegal operation at the hands of Dr. Blanche Rennick, an osteopathic physician of St. Joseph, which operation was the second one of the kind performed

upon her by Dr. Rennick; that one Oscar Payne was a friend of her husband; that her husband had informed Payne of her condition and of the fact that the operation had been performed; that the morning after the operation Hinkle brought Payne to the Hinkle home, where her husband in Payne's presence told her "that Mr. Payne had told him that if we were not too honest he had a good lawyer here that could make us a lot of money;" that Payne stated "he had the best lawyer in town to take it up and we could make a lot of money; that I could ride on a street car or bus and pretend to fall and make it appear that was what caused my miscarriage;" that she agreed to the plan and on the day appointed Payne took her and her husband to Eighth and Felix Streets; where she boarded "the Messanie street car or bus and rode out in the residential district, and I lost my nerve and got off the street car and stood on the corner and Payne and my husband met me and took me back the second time;" that she boarded the Messanie Street bus at Eighth and Felix and rode out to Eighteenth or Nineteenth and Messanie where she "pulled the cord to stop and as the bus came to a stop, I fell in the aisle. The motorman insisted on taking me back to town but I told him, 'No,' I wasn't hurt, and got off the bus and walked about half a block and Oscar Payne picked me up. He had let my husband out. We drove perhaps another block and picked him up on the corner" and went home. She told the motorman she was not hurt because Payne told her to say that. This incident occurred in the early afternoon. Mr. Payne's instructions were that she go to bed and call Dr. Toothaker, a reputable physician, not a party to the conspiracy. Mr. Hinkle called Dr. Toothaker, who was prevented from seeing her until the next morning, when he made an examination and a record of the bruises she had received in the fall. The miscarriage occurred within the next day or two in a house near the rock quarry, to which they had moved after the abortion operation.

The morning after the bus incident, Mr. Payne brought Mr. John Parkinson, Sr., to her home where she met him for the first time. She was in bed. He told her the street car company would contact her, and that she should sign nothing for them. In the way of an agreement with Mr. Parkinson, she signed a printed slip of paper with unfilled blanks on it. The miscarriage occurred later. She saw Dr. Toothaker three or four times. The next time she saw Mr. Parkinson was on a Sunday morning later when Mr. Payne came out and told her that Mr. Parkinson wanted to see her in his office, and took her there.

"He told me to stick to my story that I was looking for a house for my mother to move down. If the street car company asked me if I knew Oscar Payne, to say slightly, and to sit tight and say nothing and that he would take care of things for me. . . . He said they would take my deposition within a few days, and if they

asked me if I was still suffering from the injuries, to say I was. . . . By all means not to tell that Oscar Payne had picked me up; to say that this was some man I did not ask his name.''

A few days later her deposition was taken and Oscar Payne escorted her to Parkinson's office. She told Mr. Parkinson that she had signed a statement for the street car company. He wanted to know what kind of a fool ''I was trying to make of him.'' She told him the statement she signed was in accord with what she had been coached to say. She and Mr. Norris,. who was not present when she talked with Mr. Parkinson, went to Mr. Sprague's office, and her deposition was taken, wherein she testified according to the way she had been coached; after the taking of her deposition, she ''heard nothing from Mr. Parkinson, only through Mr. Payne'' who informed her from time to time that ''the case was going fine, and I would soon get a lot of money from it.'' That thereafter, at Payne's direction she got in touch with respondent, who informed her the case had been settled; that she went to his office where she endorsed a check and signed a release, but that the check was turned over so she could not see the face of it, nor any of the writing on the release; that Parkinson told her he would send her her money by Oscar Payne; that the following morning Payne gave her $50 in cash as her part of the proceeds of said settlement, telling her they had had to give a portion to her husband, from whom she was then separated, and that the settlement wasn't as much as they expected; that she accepted the $50 and that Payne the next day borrowed $10 of it. That later, in the spring of 1934, she sought to have Parkinson obtain a divorce for her, but at that time she did not know the whereabouts of her husband, and that Parkinson told her ''to come back later, he would get me a divorce. In the meantime, he would have another deal in which I could make a lot of money the next time, the other one didn't work as good as he thought it would.''

Respondent testified that his first knowledge of the existence of such a person as Mrs. Hinkle was when she sent and asked that he come to see her when she was ill—''word was brought to me by this man referred to as Oscar Payne . . . some three or four days after she had received an injury. Mr. Payne offered to take me out, told me she had sent him and wanted to see me and I went out; . . . Mrs. Hinkle took me into the other room and explained to me that since she had sent for me the agents of the street car company had been out to see her and she felt like she was going to be able to dispense with the services of any attorney, and asked me if I would come back in a few days;'' that at her request, communicated through Payne, and accompanied by Payne, he went to see her at her residence the second time and found claim agents of the street car company were there. He and Payne waited until the claim agents came out. On the previous occasion she had told him she had suffered a mis-

carriage and who her doctor was, and on the second trip told him, in a general way, more of the facts of the case, and at that time entered into a contract of employment agreeing to pay his firm fifty per cent of any recovery made. That he cautioned her about making any statements or discussing the case with anybody, and he directed that when she felt better to come to his office. That later she came to the office and gave him the facts of the case and thereafter he filed suit thereon, and when the defendant company sought to take depositions he sent for Mr. and Mrs. Hinkle and when they came "in a general way, I ran over the facts in the case with them as she had related them to me. I am quite confident I told her to answer the questions and to comport herself with dignity and to answer the questions fully and freely as they were; and if there was anything said about where she was going, it was because she said it in response to a question." That he was not present when the deposition was given, but that his partner, Mr. Norris, did attend the taking of the same. When asked if he had talked with Norris or anybody else about any false testimony, he testified, "I never suspicioned her at any time in my life until these charges were brought. There was not the slightest indication there was anything wrong in connection with that case." After the death of Dr. Toothaker, who had waited on Mrs. Hinkle, the defendant in the damage suit made overtures looking toward a compromise of the case, which resulted in a settlement of the suit filed by the wife and the claim of her husband for the sum of $750. That in closing the settlement, it was necessary to obtain the release of the husband, whom Mrs. Hinkle did not want to receive any money on account of his habits of drinking, and the fact that they had separated. She finally authorized respondent to pay her husband some nominal sum and "she signed the release and endorsed the check and requested that if it was settled, and if the money was paid, that I send the money to her by Mr. Payne. I had asked her if she would come in in a day or two and I would have the matter adjusted and she could get her money and she said, 'No.' she would prefer if the matter was settled I send the money out . . . if I succeeded in getting the signature of her husband, I should send the money out to her." That he was successful in getting the release of the husband for the amount agreed on, which sum he did not recall. After which he had Miss Arnold, his stenographer and bookkeeper, to cash the check and bring the money to the office "so that later that day I gave Mr. Payne the money to take to Mrs. Hinkle as she had requested. The amount of the proceeds she was getting was something, I am sure, in excess of $300 and he took the money to take to her;" that he never heard of Mrs. Hinkle after that except on one occasion when she wanted him to get a divorce for her, which he declined to do; that he paid Payne nothing on account of the Hinkle suit. Dr. Rennick was called in respondent's behalf, and she denied

having performed an illegal operation, but said she had simply made a manual examination to determine whether Mrs. Hinkle was pregnant but she was unable to tell definitely; that she never knew or heard that Mrs. Hinkle had a case against the street car company until her testimony was taken in these proceedings; that during the time Mrs. Hinkle worked for her office associate, Dr. Grow, a man she knew as "Oscar" used to come to the office to bring Mrs. Hinkle to and fro; that·she never at any time referred any case to respondent, or sent anybody to employ him as an attorney, and never divided any fees with him.

The witness Norris testified that in or about August, 1933, Mr. Parkinson asked him to go with Mrs. Hinkle to give her deposition and he did. The case was not discussed. In the anteroom Mrs. Hinkle wanted to know if they would have her statement when they examined her, and Norris told her they would if she had made one. Norris never saw her again until she took the stand here. He heard none of the conversations between Mr. Parkinson and Mrs. Hinkle.

## THE JEFFERS CASE

The commissioner's report as to the facts of this transaction is substantially as follows: Minnie Jeffers testified that she was a married woman and lived in Des Moines, Iowa; that on the 31st day of July, 1933, she went to St. Joseph, Missouri, for the purpose of having an illegal operation performed to cause her to abort; that she was about three months pregnant; that after she arrived in St. Joseph she went to the home of her mother and she learned that Dr. Rennick was reputed to be a doctor who would perform such an operation as she wanted; that in the afternoon of that date she called at the office of Dr. Rennick and made arrangements with her for the operation; that while she was on the operating table Dr. Rennick told her that she knew of a way that Mrs. Jeffers could make a whole lot of money, and told her that she had a lawyer in St. Joseph who would bring a damage suit and recover a big verdict for her; that Dr. Rennick told her of the scheme; that after the abortion she could go out on the street and that the other co-conspirators would appear to be driving an automobile down the street and would casually run the same into and against her and that she would pretend to be injured; they could employ this lawyer thereafter and all of them could make some money. She testified that Dr. Rennick went to the telephone and called somebody; that Dr. Rennick told her that the next day some parties would be at her home to see her and arrange for the perpetration of the fraudulent scheme. She testified that the next day Oscar Payne and some other party called to see her and arrangements were made for carrying out of the faked accident. She testified she went thru with the scheme and that she was actually injured when the automobile struck her; that she was taken to the home of her mother by George Barker and that he told her he was heavily insured and that it was

all his fault. She testified that later the respondent came to see her about her case against Barker, and that she entered into a contract with Mr. Parkinson whereby she employed him to be her attorney and to pay him on a contingent basis, seventy-five per cent of any amount recovered by suit or compromise; that the respondent was to pay Barker twenty-five per cent; retain twenty-five per cent for himself and distribute the remaining twenty-five per cent among Dr. Rennick, Cox and Payne. Mrs. Jeffers further testified that she had not seen Oscar Payne before or since the accident and that she did not know the driver of the car who pretended to force the Barker car to hit her. She testified that Parkinson brought a suit for her in the Circuit Court of Buchanan County and also filed a suit for her husband for damages for loss of his wife's services. She testified that she corresponded with Mr. Parkinson about the lawsuit and that she went to St. Joseph, Missouri, to give her deposition; that she falsely testified in her deposition as directed by the respondent to testify. She further testified that her husband did not know of her miscarriage and that he had not learned of the fraudulent plan and scheme to defraud the insurance company until one day when they were driving down to St. Joseph for the purpose of seeing Mr. Parkinson about settling their lawsuits, after they had been approached by some insurance company lawyer to settle the cases without consultation with Mr. Parkinson.

Mr. Jeffers testified that he accompanied his wife to St. Joseph and that he told the respondent that he wanted these lawsuits settled; that he was not going to permit his wife to go on the witness stand and tell any more lies. He further testified that Mr. Parkinson immediately got busy and settled both cases with the insurance company for $1500 and paid $200 to Minnie B. Jeffers and her husband as their share of the settlement.

George Barker, one of the charged conspirators, in this case, and a brother of Eva Hinkle, testified that Oscar Payne induced him to procure a liability insurance policy from some insurance agency in St. Joseph, Missouri, covering him against loss or damage by reason of his negligence in the operation of his automobile; that on June 6th, 1933, he procured this insurance policy and within a few days thereafter, in company with Oscar Payne, took it to the office of the respondent and that Oscar Payne said to Parkinson: "This is the boy who is taking out the insurance and is going to have the wreck with the pregnant woman from out of town." Barker further testified that Mr. Parkinson asked him to permit him to see the policy and that after looking over the policy Parkinson gave it back to Barker and patted him on the back and said, "That policy is all right, young man, you keep it and we will make a lot of money."

The respondent testified that Minnie Jeffers did employ his firm to bring a suit for her and one for her husband to recover damages

for personal injuries sustained by her and for loss of her services, sustained by her husband, by reason of having been struck by an automobile driven by one George Barker on the 1st day of August, 1933, and that respondent's firm in good faith filed the suits in the Circuit Court of Buchanan County, Missouri, and the proceeds of the settlement were divided according to the contract. The respondent testified that he never saw George Barker, to know him, until his deposition was taken in the office of the respondent; that he never saw him before that and never saw him after that and had no conversation with him of any kind or character, except when Barker's deposition was given in the suit brought against him by the Jeffers. Respondent further testified that Mrs. Jeffers made a contract for herself and husband whereby they employed the respondent's firm as their attorneys and in these contracts agreed to pay this firm of lawyers fifty per cent of any amount that would be recovered by suit or compromise. Respondent further testified that after the relation of attorney and client had been created between him and Mrs. Jeffers he advanced to her some money for the purpose of relieving her financial distress and that it was to be distinctly understood between him and Mrs. Jeffers that any amounts advanced by him were to be taken out of her share when the cases were settled. He further testified that he did not know there was anything fraudulent about the Jeffers case; that he brought the suits in good faith and that at the time they were settled and the proceeds divided he had no information whatever that there was any fraud connected with the cases in any way. He further testified that Mrs. Jeffers and her husband received fifty per cent of the amount for which the cases were settled. An affidavit made by Mrs. Minnie Jeffers on the 7th day of June, 1935, and witnessed by M. J. Barry, Charles Edward Lavery and Ross F. Jones was offered in evidence.

An affidavit of George Barker, signed by George Barker on the 29th day of May, 1935, and witnessed by Charles Edward Lavery, Jr., Ross F. Jones, Dorothy Hooser and Ethel Hill, was offered in evidence.

Mrs. Jeffers states in her affidavit that while she was in Dr. Rennick's office on July 31st, 1933, Dr. Rennick called the respondent, John Parkinson, over the telephone. In her testimony before the commissioner, Mrs. Jeffers stated that she did not know who Dr. Rennick called over the telephone.

George Barker stated in his affidavit that sometime between July 1st and 10th, 1933, Oscar Payne took him to Parkinson's office and introduced him to John Parkinson and told Mr. Parkinson that—"this is the boy who is going to have the wreck with the pregnant woman from out of town." He further stated in that affidavit that on July 31st, 1933, Oscar Payne called him on the telephone and told him that they were ready to carry out the scheme to defraud the insur-

ance company by having a faked accident with his automobile. In his testimony before your commissioner, George Barker testified that he had an accident with the Jeffers woman in the month of August, about six weeks or two months after taking out the insurance policy and that when he was up in the office of John Parkinson he did not know anything about a pregnant woman coming to St. Joseph from out of town and that he was a little "mixed-up" about it.

On the 5th day of November, 1936, Roy G. Jeffers subscribed and swore to a statement before a Notary Public in Polk County, Iowa, which affidavit was introduced in evidence, and in which he practically retracts all of the incriminating testimony he gave against the respondent.

The evidence discloses that on the date of the alleged conversation between Barker and Parkinson in Parkinson's office about a pregnant woman from out of town, no one connected with these cases, and none of the witnesses knew Minnie Jeffers; none of them knew that she was pregnant and coming to St. Joseph. She testified that her husband did not know that she was going to have an abortion performed. Mrs. Jeffers, in her testimony, states that she did not know who Dr. Rennick called over the telephone; yet the affidavit recites that Dr. Rennick called the respondent, John Parkinson. Dr. Rennick denied she produced an abortion on Mrs. Jeffers, or that she even knew her at the time in question, and denied participating in said fraudulent scheme.

### THE WEBB CASE

In the Webb case it is charged that on the 26th day of March, 1935, the respondent entered into a conspiracy with Oscar Payne, Norman Fisher, Ross Cox, Lloyd and Lulu Webb and Eva Haynes to defraud a liability insurance company. The scheme was that Lloyd Webb, Lulu Webb and Eva Haynes would make it appear that Norman Fisher, a driver of an automobile for the Sterling Cleaners who carried liability insurance, would strike them while they were pedestrians on the streets of the City of St. Joseph, and that they would pretend that they were injured as a result of the negligence of the driver of said automobile, and that they would file fraudulent suits, falsely charging that they sustained serious injuries as a result of the negligence of Fisher, as the driver of said automobile and that respondent would be employed to bring the suits. To support this charge informants introduced Lloyd Webb and his wife, Lulu Webb, as witnesses. Of this charge, the commissioner reported: "Your commissioner does not desire to burden this report with even a synopsis of the testimony of Lulu and Lloyd Webb. It would serve no purpose in this report." Enlarging upon this, it may be said that this case has the same general framework as the other cases with which respondent was alleged to have been connected. According to the witnesses mentioned, Payne

took Mrs. Webb and Eva Haynes to 6th & Sycamore. Mr. Webb went with Ross Cox, a rental agent for Parkinson. They met in the neighborhood of the bridge across the Missouri River, leading to Elwood, Kansas, where the Webbs resided. By prearranged plan, when Mr. and Mrs. Webb and Eva Haynes were ready to cross the street to go to the bridge, a Sterling Cleaners' truck came from back of them, both wheels ran upon the sidewalk and struck them and knocked them down. They were assisted home by a minister who happened along at the time and Fisher, the driver, reported the accident to the police. As they passed over the bridge both Mr. and Mrs. Webb testified they saw Oscar Payne sitting in his car about a block away from the scene of the accident. Mrs. Webb was not aware in advance that the accident was going to happen and, if her husband prearranged it, she did not know about it in advance. Suits were instituted on behalf of Eva Haynes and Mr. and Mrs. Webb and their depositions taken. While their suits were pending this investigation was started, until which time the respondent testifies that he knew of nothing to create suspicion that the Webb case was anything but a *bona fide* case. The Webb case is admittedly weaker than the other two hereinbefore described. Of it the informants' brief says. "These people (referring to Mr. and Mrs. Webb) were illiterate and unschooled, and their intelligence, particularly that of Mrs. Webb, was decidedly below the average. If the Webb case stood alone, the Committee would not urge it as a ground for disbarment."

Concerning the credibility of the witness Eva Hinkle, our commissioner reports as follows:

"The witness, Eva Hinkle, while testifying before your Commissioner, admitted that she made conflicting statements and had given evidence before the Bar Committee contradictory to the testimony she gave before your Commissioner. She further admitted she testified falsely when her deposition was taken. In fact, she admitted that she had committed perjury.

"Your Commissioner does not believe the statements made by this witness, Eva Hinkle, concerning John G. Parkinson's connection with any conspiracy existing between her and Oscar Payne to defraud the bus company. Her testimony was not corroborated by any witness. It is not worthy of belief. The fact that she stated that Parkinson tried to get her to bring another faked damage suit against some defendant, when she went to consult him about obtaining a divorce, is very strong evidence to your Commissioner's mind that her story is not true. The first time she ever testified to this occurrence was in this hearing before your Commissioner and if the respondent were conducting a law practice like it is alleged, he would not very likely have the same persons faking accidents repeatedly.

"The evidence discloses that respondent did not know that Eva Hinkle had a mother, consequently her evidence that he told her to

testify she was looking for a house for her mother must have been a fabrication.

"Your Commissioner observed this witness on the stand; he watched her demeanor and conduct while testifying; it appeared to your Commissioner that she was making a studied effort, struggling to remember what she had said and what had been said to her, and her testimony is not worthy of belief and is incredible, and, consequently, this charge must fail."

Of the Jeffers' case and informants' witnesses in connection therewith, the commissioner reports:

"Your Commissioner saw these witnesses on the stand. He observed their demeanor. He had an opportunity to watch them closely and did so. The witnesses, Minnie Jeffers and George Barker, admitted that they had made false affidavits; they admitted that they testified falsely while under oath when their testimony was taken by depositions; they admitted contradictions, inconsistencies and conflicts in their testimony, with the testimony they had given before the Bar Committee, and, taking into consideration their demeanor on the witness stand, the improbability and the motives actuating their statements, your Commissioner is of the opinion that their testimony, at least where it tends to connect the respondent, is unworthy of belief, and is false."

His conclusion with respect to the two witnesses offered in support of the Webb case was as follows:

"Your Commissioner believes that the testimony of Lulu Webb and Lloyd Webb is absolutely false, and, consequently this charge must fail."

And so, in disposing of the three cases, he says:

"The testimony of the witnesses for the informants in the three cases, The Hinkle Case, The Jeffers Case and the Webb Case, where it tends to connect the respondent with the conspiracies charged therein is, in the opinion of your Commissioner, absolutely false. This testimony was the testimony of accused co-conspirators or accomplices. The testimony was not corroborated by any credible testimony. Most of the witnesses, in fact all, were self-confessed perjurers.

"Your Commissioner is of the opinion that a Missouri lawyer should not be disciplined or disbarred on the un-corroborated testimony of self-confessed perjurers and unmitigated liars."

█ The informants vigorously assail the commissioner's report, and insist that, notwithstanding such report, upon a review *de novo* of the record and evidence in this case, the respondent should be found guilty. The findings of fact of a special commissioner are not binding, but are persuasive (State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, 169 S. W. 145), or, as said in State ex inf. v. K. C. College of Medicine & Surgery, 315 Mo. 101, 285 S. W. 980, 46 A. L. R. 1472, "the conclusions of the commissioner are not binding on this court, but they are advisory and helpful."

The insistence of informants is based on a variety of reasons, the most important of which, and those meriting discussion will be treated. No unfavorable inference is to be drawn, as the informants imply, from the fact that respondent did not urge the *bona fides* of the inception of the Hinkle, Jeffers and Webb transactions. The fact that each of them was fraudulent cannot remain in doubt in his mind, nor in ours, but the vital and controlling question, is, of course, whether respondent was a party to, or had guilty knowledge of the conspiracies to prosecute such fraudulent claims. The evidence does disclose circumstances which are not favorable to respondent, among which is the fact that, contrary to the usual office routine, payments were made to the clients in the Hinkle and Jeffers cases in cash rather than by check. Both of these cases involved substantial sums of money, and no receipt was taken from the clients showing the receipt of their portion of the proceeds of the settlements. This, together with the fact that the office files in each of these cases had been destroyed is urged as one of the reasons for overthrowing the commissioner's findings. In fairness, it must be said that on the part of respondent it was shown that the office files in all such cases as had been compromised or closed were usually and customarily destroyed after six months or a year, all original court papers, such as pleadings, depositions and the like, being first returned to the office of the circuit clerk, where they were always available. However, certain data, such as the amount of advancements made to clients, were shown only by expense sheets placed in the office files, which, when destroyed, made it impossible to ascertain and check such items. While it is perhaps going too far to say that we take judicial notice of the fact that files are not, in the ordinary law office, so expeditiously dispatched, and that settlements with clients are not effected without so much as a line showing the receipt of substantial sums of money, they are at least highly unusual practices, and, in this case, amount to strongly suspicious circumstances, and we so view them.

It is further urged that because respondent's testimony touching such details as time and place of office visits, method of contact, manner of payment, taking of depositions and settlements in the cases is not at variance with that of informants' witnesses, it is corroborative of the latter witnesses. The nature of the defense considered, we do not think such a conclusion logically follows. Indeed, the fact that the evidence "dovetails" in these respects is quite as consistent with innocence as with guilt (except, of course, in the particulars just mentioned hereinabove.) For like reasons, the same may be said concerning what the informants' call the "technique" in the Hinkle and Jeffers cases, that is, both were cases growing out of illegal operations, but so constructed as to make it appear they were produced as the result of accidents. We are not prepared to, and need not say, what our decision would be on such facts standing alone; but that is not the case before us on this record.

Much emphasis is placed upon the supposed connection between respondent and Dr. Rennick, and the fact that she figured in both the Hinkle and Jeffers cases. It is particularly stressed that because respondent became her bondsman when she was charged with the crime of manslaughter in Buchanan County, at a time when respondent claims he scarcely knew her, the inference arising therefrom is damaging. He seems to have made a satisfactory explanation of the circumstances under which he signed her bond, which was that late one Saturday afternoon, when his partner, Mr. Mytton, for whom she had called, was not available, he did sign a bail bond for her for the sum of $5,000. He and his partner were unable to agree with her upon a fee for representing her in the criminal case, and she went elsewhere for counsel. He testified that she had been used as an expert witness in only one case in which his firm was interested, and it does seem that if there had been any working arrangement between them it might have been more satisfactorily established.

Finally it is insisted that respondent's failure to call as a witness Oscar Payne, who was present throughout the hearing, "is a circumstance against him which, as a matter of fact and as a matter of law, leads irresistibly to the conclusion that Payne's testimony to the knowledge of respondent would have been adverse to him." This contention is made on the theory that Payne was in the employ of respondent, and, because of that relationship, he was under the control of the respondent, and, therefore, peculiarly available to him. On the other hand, respondent says he is not subject to any unfavorable inference because he did not call Payne as a witness and that the inference is the other way—against the informants—because they did not call Payne as their witness. Both sides cite McGinnis v. St. Louis-Southern, Inc., 341 Mo. 677, 108 S. W. (2d) 113, which in turn cites Rothschild v. Barck, 324 Mo. 1121, 26 S. W. (2d) 760, but we do not think the facts bring this case within the rule of those cases. In the first place, if, as informants insist, Payne had been a solicitor of cases for the respondent and his firm on the scale contended for, it would have been a comparatively easy matter to have established that fact by an abundance of evidence. Instead, much reliance seems to be placed on what is referred to as Parkinson's admission that Payne was his solicitor, or that he was associated with him under an informal arrangement of employment, but we do not so read the record. Payne, who was a railroad employee, rendered services to respondent of one kind or another from time to time over a period of years. Parkinson represented him in certain litigation. He testified that Payne seemed to have a penchant for borrowing small sums of money, which debts were liquidated by rendering services to Parkinson, such as investigations, locating trucks, giving him information with respect to railroad equipment, etc. It seems fairly certain from the record before us that Payne had not been a frequenter of the Park-

inson office for quite some time before this investigation was started, but had been in only occasionally. At the first meeting of the Bar Committee at which the respondent appeared, when certain other of his activities were under investigation, and he was informed by the then Chairman of Bar Committees that he should produce certain witnesses, including Payne, Parkinson at that time informed the Committee as follows: "I will say to the Committee right now that I shall not in any way connect myself with Mr. Payne, and I will not vouch for him." To which the reply was, "You are not vouching for him. We are not trying this as a jury. We don't want to do any injustice; we want all the facts and we are capable of passing on Payne's credibility. This occurred on August 10, 1936, which was nearly eight months before the information in this case was filed. Payne was in attendance through the hearings before the special commissioner. He was there under subpoena issued by the informants. Under these circumstances, the applicability of the rule contended for by informants must be denied.

As to counts 5, 6, and 7, it may be said that at the hearing before the commissioner, he inquired, after an opening statement was made detailing the evidence to be adduced in support of the charges contained in counts one, two, three and four, if the last three counts were abandoned; that counsel replied. "We carry them along. In other words, if your Honor please, if we prove the first four counts, then necessarily the next three stand. Now, if we fail to prove a conspiracy, yet the last three counts could be proven without us proving *in toto* the first four counts." No attempt was made to prove the last three charges independently of the first three, and the commissioner reports. "There is no evidence that the respondent divided fees or agreed to divide fees with persons who were not lawyers. There was no evidence introduced to show that the respondent initiated fictitious claims and instituted suits thereon. There is no evidence that the respondent employed agents and runners to solicit and persuade persons to employ him as their attorney to institute suits for and in behalf of any person."

We are not impressed with the defense that a "foul conspiracy" to destroy respondent as a lawyer operated to bring about the filing of these charges. On the contrary, we concur in, and specifically adopt the following from the report of the special commissioner; "Your Commissioner is of the opinion that the informants were not actuated by any malice or ill-will toward respondent, nor were they moved by personal motives for private vengeance or private gain. Informants have an onerous, disagreeable and unpleasant duty as a Bar Committee, but they do not shrink from that duty. Under their pledges of fidelity to see that no foul pollutions are permitted to contaminate the juridical stream, and influenced solely by a consideration to discharge their duties in the important trust committed to

their hands, the Information was signed and filed by them in this case. *Of that there can be no doubt.*"

Our learned commissioner was appointed not alone because of his recognized high standing as a lawyer, but also because of our confidence in his ability to draw sound and accurate conclusions from conflicting evidence on disputed questions of fact, and so to aid us in the discharge of our duties. And this we are satisfied he has done with a marked degree of understanding and discernment, and we acknowledge our appreciation of, and indebtedness to him for his valuable services. His opportunity to form a proper estimate of the weight and value to be given the testimony of the several witnesses is admittedly superior to ours. He saw them on the stand, and observed their attitude and demeanor while testifying, and, indeed, bases his findings, in large part, thereon. We have carefully considered the several matters urged upon us by the informants, and while meritorious, they are not deemed sufficiently convincing as to justify us in rejecting the findings of our commissioner, and substituting therefor a contrary, independent judgment based upon the cold record alone. Being persuaded by his findings, upon a careful consideration of the whole case, we are of the opinion that the informants have failed to sustain the burden of establishing the truth of the charges by a preponderance of the evidence, and accordingly, the same should be dismissed, and the respondent discharged. It is so ordered. All concur.