In the Matter of Disbarment Proceedings against L. A. WARDEN.—146 S. W. (2d) 874.

Court en Banc, February 1, 1941.

*H. Templeton Brown* and *Stephen K. Owen* for informants.

*Dean H. Leopard, Elliott Kitt* and *Paul D. Kitt* for respondent.

LEEDY, C. J.—Original proceeding, instituted by leave of court under our rule #36, by which it is sought to disbar respondent, L. A.

Warden, an attorney practicing ·at Trenton, Grundy County, for alleged professional misconduct. The specific acts charged in the information are:

"1. That accused did, on or about the months of June or July, 1936, forge, or cause to be forged, a certain marriage record and index thereto with reference to the purported marriage between Guy A. Thompson and Jénnie Morrison Smith, as more fully appears in the Marriage Record Book 13 in the office of the Recorder of Deeds within and for Grundy County, Missouri.

"2. That on or about the months of June or July, 1936, a certain marriage record and index thereto with reference to the purported marriage between Guy A. Thompson and Jennie Morrison Smith, as more fully appears in the Marriage Record Book 13 in the office of the Recorder of Deeds within and for Grundy County, Missouri, was forged; and that accused, knowing that the aforesaid marriage record and index thereto was forged and falsified, did, in the year of 1936, attempt to make use of the same for his own benefit."

Respondent answered, denying generally the first charge, and set up a plea in bar. No evidence was offered in support of the latter, and it has been abandoned. The answer to the second charge was a general denial coupled with allegations, as follows: "that on or about the —— day of June, 1936, he was consulted by one Jennie Morrison Smith, so known to him, whom respondent knew by reputation only and who enjoyed a good reputation for truth and veracity, who represented to him that she had been married to and was the widow of Guy A. Thompson but that such marriage had been kept a secret and that the marriage license had been retained by said Guy A. Thompson and so far as she knew, no record evidence of such marriage existed; that respondent was employed by said Jennie Morrison Smith Thompson to represent her in connection with her claims as such widow, as aforesaid, and to bring any appropriate suit or proceeding to establish her status and rights as such widow; that respondent examined the marriage records of Grundy County and that said records reflected such marriage as of the date on which such marriage was represented to have been solemnized, and found that Marriage Record 13 at page 312 contained a record of such marriage license and a certificate of such marriage; that said record appeared then as it does now and respondent at no time made any change therein; that respondent inquired of Elvin Bechner, and Recorder who made such record and was informed by said Recorder that said record was genuine and that said marriage license was issued and that said marriage occurred as evidenced by said record; that if said record was forged, respondent has no knowledge thereof, and no means or reason to know thereof; that respondent in good faith instituted a suit in behalf of his said client, believing that his client had rights and claims which she was entitled to have adjudicated by the courts,

and took depositions in said suit for the purpose, among others, of ascertaining and establishing the truth respecting the record aforesaid; that later, after learning that said Recorder had made various differing and conflicting statements in regard to the record aforesaid and the facts evidenced thereby, he terminated his employment and representation of his said client and did not further prosecute said suit.''

A special commissioner was appointed to take the evidence, which he has returned together with his report recommending that the charges against respondent be dismissed. The case turns upon questions of fact, and inasmuch as we have reached a conclusion contrary to that of our learned commissioner, it will be necessary to state the facts at some length.

Guy A. Thompson was a wealthy landowner residing in Grundy County, who died September 24, 1935, leaving an estate reputed to be in excess of one-half million dollars. He was known in the community as a bachelor, and was survived by one sister, Eulah T. Drury, but by no parents, brother or descendants.

The suit for partition brought by respondent as attorney for Jennie Morrison Smith (captioned ''Jennie Morrison Thompson v. Eulah T. Drury''), which was predicated upon the alleged status of plaintiff therein as the widow of Thompson, and out of which these charges grew, was filed in the Circuit Court of Grundy County on July 6, 1936, more than nine months after the death of Thompson. In this opinion Mrs. Jennie Morrison Smith (-Thompson?) will be referred to as Mrs. Smith.

It is perfectly clear that there had been a long association between Thompson and Mrs. Smith extending over a period of many years, even antedating her marriage to one Orville A. Smith in the year 1914. The relations between Thompson and Mrs. Smith, during the time she lived with her husband, Smith, were such as to figure in their divorce suit, which culminated in a decree in 1921. After Mrs. Smith returned to the home of her father, Maxwell Morrison, following the divorce, some relationship between Thompson and Mrs. Smith continued to the date of the death of Thompson in 1935. This was reputed in the community where both resided to be one of intimacy, but at no time did they live together openly as man and wife, and at no time did Mrs. Smith live with Thompson at his home.

One Elvin Beckner held office as Recorder of Deeds of Grundy County for one term, the years 1931-1934, both inclusive. His admitted connection with the making of the marriage records in question and his conduct and statements touching the same constitute an important aspect of this case.

It appears from the evidence that in the issuance of a marriage license, there is delivered to the parties a document consisting of two parts, separated by a perforation through the middle. One of these parts, that captioned ''Marriage License,'' has a form of return at the bottom which is to be filled out by the officiating minister or officer, certifying that at a certain time and place the persons named in the license (above) were united in marriage, and further certifying his qualification to solemnize marriages. This is required by law to be returned by the person solemnizing the marriage to the office of the Recorder of Deeds for recording ''within ninety days after the issuing of the same.'' The other portion referred to constitutes a certificate of the marriage, and after being detached is delivered by the officiating minister or officer to the contracting parties. [See Secs. 2978, 2980, 2982, R. S. 1929, secs. 2978, 2980, 2982, Mo. Stat. Ann., pp. 5042, 5043, 5044.]

For the purpose of recording marriages there is maintained in the Recorder's Office a bound book of printed forms corresponding in text with the license, including the return. [Sec. 2979, R. S. 1929, sec. 2979, Mo. Stat. Ann., p. 5043.] In the office in question, provision is made for recording two marriages on each page of the record, one at the top of the page, and the other at the bottom. The Recorder is required to keep indexes to all books of record in his office wherein certificates of marriages are recorded. [Sec. 11550, R. S. 1929, sec. 11550, Mo. Stat. Ann., p. 6704.] In compliance with this section, there was kept and preserved in the Recorder's Office in Grundy County both direct and reverse indexes to marriage records corresponding to the abstract and index of deeds, provided by Section 11546, Revised Statutes 1929 (sec. 11546, Mo. Stat. Ann., p. 6702), the direct index being alphabetically arranged for the names of males and the reverse index alphabetically arranged for the names of females. There is also a form of application for a marriage license, but under the system in use at the time in question, the then Recorder says one was not always required.

There is also another book called the ''file book'' showing, in chronological order, instruments deposited for record in the office of the Recorder. This record, however, Beckner contends was not required by law to be kept, but was maintained by him for his private use in keeping a record of fees paid in.

A reproduction of the purported record of the purported marriage in question (Record 13, page 312), which, as the respondent avows,

is now in the same condition as when he first discovered it in the Recorder's Office, is shown by the following photostat:

There are entries in both the direct and reverse indexes, admittedly in the handwriting of Beckner, purporting to refer to the foregoing record, but the same are irregular in two respects: First, because made by interlineation; second, and what is more significant, they are defective in that the wrong index was used in each instance. That is, in the direct index (that arranged alphabetically for the names of *males*) the name of Mrs. Sarah, not that of Thompson, appears; and in the reverse index (that arranged alphabetically for the names of *females*) the name of Guy A. Thompson, and not that of Mrs. Smith, is set forth. Thus a person making a search of the marriage records in the usual and customary way, by resort to the indexes required by law to be kept alphabetically under the names of both male and female, would have discovered no reference to the purported Thompson-Smith marriage.

There is no entry in the "file book" heretofore referred to reflecting anything in connection with the purported marriage. It is entirely silent in that respect.

Respondent filed the partition suit on July 6, 1936, and five days thereafter, to-wit, on July 11, he took Beckner's deposition wherein the witness gave his explanation of the alteration of the record shown by the photostat heretofore set out. In maintaining the authenticity

of that record, as altered, and the bona fides of the Thompson-Smith marriage purporting to be shown thereby, he testified in substance and effect, as follows: That on April 8, 1931, upon written application therefor, he issued a marriarge license to Donald Hestir and Josephine Comella, and noted the same in the "file book" by appropriate entry; that about 9:30 that evening, as he was leaving the picture show, he was requested by Roscoe Kavanaugh, then prosecuting attorney of the county, to go to his (the Recorder's) office for the purpose of issuing a marriage license, which he consented to do; that he went to the Court House and Kavanaugh "brought Mr. Thompson and Mrs. Smith there, and he went and got Judge Drummond, and I issued the license and Mr. Drummond married them" in the Recorder's Office in the presence of the witness and Kavanaugh; that Thompson inquired if he could keep it a secret, to which the witness replied he would have to put it on the record within ninety days; that thereupon Kavanaugh (who was Thompson's attorney and likewise the legal adviser of the Recorder) instructed him to get the marriage license record, and further directed him to enter therein (at page 312) the *Hestir-Comella* marriage, for which a license had been issued that day, and this he did, the purpose being "to hold this place blank here for the *Thompson* license." [Just how this would be possible, the witness did not undertake to further explain.] He also testified that he (Beckner) filled out the certificate and return for Judge Drummond to sign, and handed them to Judge Drummond, who signed the same. Whereupon Thompson picked up all the papers, including the application, and put them in his pocket, saying, "I want to know that this is kept a secret because my life has been threatened. . . . I will return them to you in a certain length of time." The witness further testified that Thompson "told me that he would stand by me and protect me, and so did Judge Kavanaugh;" that he frequently attempted to get Thompson to return the license, but was unsuccessful in so doing until December 15, 1934, some two weeks before his term of office expired, when, in pursuance of insistent demands, Thompson brought in the license, and he "recorded" it, and then returned it to Thompson; and that the record was, at the date of the taking of the deposition, in the same condition as when he went out of office as Recorder. There is much confusion and self-contradiction in the testimony of the witness, not only as to the time he altered the record showing the Hestir-Comella marriage by inserting matter reflecting a marriage between Thompson and Mrs. Smith, but touching other details as well. The witness first stated that he inserted the names of Thompson and Mrs. Smith about a week after April 8, 1931. But this statement was changed and he finally stood on the proposition, as nearly as we are able to understand it, that the names of Thompson and Mrs. Smith were not inserted and the record of the return of that purported marriage was not completed until December 15, 1934. He stated that

the dates April 8, 1931, and December 15, 1934, appearing at the bottom of the record, and purporting to show the date. the instrument was filed for record, were both used because of the fact that, while he had actually completed the return for the justice of the peace on April 8, 1931, it was not redelivered to him again by Thompson until December 15, 1934.

A later entry in Book 13, at page 334, shows the due and regular recordation of the Hestir-Comella marriage. That marriage is shown by the return to have been performed on July 3, 1931, by Rev. Peter B. O'Rourke at Immaculate Conception Rectory in Macon County, and the certificate was filed for record on July 7, 1931. Roscoe Kavanaugh died prior to December 15, 1934, and Judge Drummond died several years before the taking of Beckner's deposition.

Following the taking of Beckner's deposition and before the same was signed, an Assistant Attorney-General, William O. Sawyers was sent to Trenton to make an investigation at the behest of the Thompson estate. Beckner made a statement to Sawyers, which was reduced to writing at the Plaza Hotel in Trenton, and sworn to by him. In that statement he repudiated the testimony he had given by deposition, and stated the facts to be that between June 27 and July 5, 1936, Warden called him by 'phone at his home at Dunlap, and arranged for Warden's son to bring him to Trenton; that when he got to Warden's office, Warden said to him: "If you will help me win this Thompson lawsuit you won't have to work any more." "He wanted to know if the marriage records at the Court House could be fixed and I told him 'No.' He said it could. Then he (Warden) went to the Court House and got the book and brought it up to his law office. . . . Just he and I were there. He laid Marriage License Book 13 on the table and told me there could be no criminal charges filed against me and I told him that I did not know the law on that. He insisted that I put Mr. Guy Thompson and Jennie Morrison Smith in place of Donald Hestir and Josephine Comella, whose names were on that record at page 312. He wanted their names written by my handwriting because I was Recorder of Grundy County in office between January 1, 1931, to January 7, 1935. I issued the Hestir-Comella license on April 8, 1931, but the return was not made by the priest for several days. The law requires the recorder to record the license when they are issued and the return is made when the license is returned to the recorder by the judge, priest or minister who married them. . . . I recorded the Hestir-Comella license when it was issued and that appears on page 312, but my clerk, or deputy, did not know it was recorded at the time the license was returned by the priest. And he recorded them on page 334. . . . The Comella-Hestir marriage showed in two places that the license had been issued, but only at page 334 that it had been returned. . . . Mr. Warden insisted that I fill in the return. I did not think it could be done but

204

he said , 'Now you go on and do it.' . . . He told me to put in Judge John Drummond's name on the return of Guy Thompson and Jennie Morrison Smith. . . . He told me to date it December 15, 1934. . . . He told me to scratch out the names of Hestir and Comella with my knife and I told him 'No.' Then he told me to just draw a line through them and I did. 'Q. Whose pen did you use when drawing the lines through, and filling out the justice of peace name and the date that you speak of? A. Mr. Warden's.' '' He further stated that at Warden's request, he changed the indexes about a week thereafter by going to the Recorder's vault and secretly writing in the names of Thompson and Smith by interlineation. And after leaving the Recorder's Office he called Warden's office and told the office girl to tell him that he had attended to that business. On the day the record was changed he said Warden told him that he and ''the Smith woman would be the only living persons that could say that they were married. He told me that Thompson and Smith was supposed to be married in my office after night and that Roscoe Kavanaugh and I witnessed the marriage and that Judge Drummond performed the ceremony.'' The witness further said in his statement, ''He told me in his office that he might want to take my deposition but would let me know when. He came out to my house the night before he took depositions and told me that mine would be taken tomorrow.'' And that, ''that first day in Lawyer Warden's office I saw him destroy two pages of Justice John Drummond's marriage record book. Just he and I were present.''

After Beckner gave his statement to the Assistant Attorney-General, the defendant in the partition suit sought to take his deposition, but upon advice of counsel, he stood on his constitutional rights and refused to answer on the ground it might incriminate him.

It was shown by G. M. Herndon, Judge Drummond's successor in office, that during the week of June 30, 1936, respondent borrowed the cloth-bound record in which were recorded marriages performed by Judge Drummond, and later by the witness. That respondent took the same to his own office, and the witness had some difficulty in getting it back, having requested its return several times and finally, some three or four days after it had been taken, he sent his office girl to respondent's office for it. When she brought it back it was discovered that pages 65, 66, 75 and 76 were missing. The record shown at page 74 is that of a marriage on January 25, 1931, and the last one shown by the record to have been performed by Judge Drummond. Page 77 records the first marriage performed by the witness Herndon. The witness was unable to state positively that the missing pages were in the book at the time respondent got possession of it. He testified that after the young lady brought it back he went through the book immediately and made the discovery above-mentioned, and that he had theretofore glanced through the book occasionally, as a

matter of curiosity, to see what people Judge Drummond had married with whom he was acquainted, and he had never seen any record of the purported Thompson-Smith marriage. He said respondent did not say what he wanted with the book when he came for it, nor did the witness say anything to respondent about having discovered the pages were missing.

Beckner was called as a witness on the part of informants at the hearing before the special commissioner. There he repudiated the statement he had given to the Assistant Attorney-General and reverted to the story detailed in his deposition, this notwithstanding the fact that only a few days prior to the hearing he had assured counsel for informants, in the presence of three other witnesses, that what he had said in the Sawyers statement "was just about true." His testimony on this occasion, like that given by deposition, is full of contradictions and inconsistencies, and on that account, it is exceedingly difficult to follow. It was developed that in addition to the statement made to Sawyers, he had told one of the members of the Bar Committee that respondent had agreed to pay him $10,000 for his testimony. We will not undertake to set forth the respects in which the witness apparently sought to "doctor" or bolster up the story he had detailed by deposition. In this connection it may not be amiss to make reference to the impression made by this witness upon our commissioner, who reported the following: "The commissioner observed this witness closely while on the stand. His conduct and demeanor bore ear-marks commonly associated with perjury. Confessing to the commission of perjury on one occasion as to the exact facts about which he purported to give testimony in the hearing before the commissioner, his record must condemn him in this proceeding and destroy the evidentiary value of any testimony he purports to give, and with respect to his testimony offered at the hearing your commissioner so finds."

J. P. Rice, principal of the penmanship and accounting department of the Chillicothe Business College was called by informants, and, from twenty-five years' experience in the identification of handwriting and inks, qualified as an expert on questioned documents. He testified with respect to the record in question that the lines by which the names and places of residence of the parties in the Hestir-Comella marriage were stricken, and the handwriting in which that information is shown with reference to the Thompson-Smith marriage (the inserted matter) were made with a very dark ink having a carbon base; that the numerals three and four and the parentheses in which they appear ["(34)" at the bottom of the page showing the date of filing] were written with the same ink. As to the word "December" he testified it "has had something damp over it which has destroyed or dissolved the carbon that is supposed to be in ink, and it does not show," for which reason he could not say whether that word was written in the same ink. The original and first amended petitions in the partition

suit, bearing the admitted signatures of respondent, were offered in evidence. On a comparison of the same with the altered record in question the witness testified that Warden's signatures thereon "show the same ink as on page 312 of the marriage license in the words 'Guy A. Thompson' . . . and 'Jennie Morrison Smith' . . . It shows the same kind of ink—high, black, gloss."

Various marriage records recorded by Beckner on December 6, 8, 11, 12, 19, 22, 24 and 27, 1934, and January 2, 1935 (covering the period immediately before and after December 15, 1934, the date he claims he made the alteration) were examined by the witness and compared with the alterations in question. From such comparisons, the witness testified that all of said records so examined were made with different ink from that used in inserting the Thompson-Smith data, the difference being in its color and nature, i. e., it was of lighter color and had an acid base. The same was true with respect to the index entries in question, which were made in a lighter, acid base ink, blue in color, and which would not turn darker. He identified the alterations in question and the admitted signatures of respondent to the petitions as being in carbon base ink "on account of the dark body . . . and if it has carbon in it, it will look glossy—black and glossy. The carbon stands out. The carbon does not dissolve entirely," coupled with his examination of the alterations and said signatures, made under a magnifying glass, which disclosed small particles of carbon standing up which do not appear in other ink. He testified that carbon base ink is not suitable for use in fountain pens, but that either acid base or powder base inks are used for that purpose. The altered record is the only one of the many examined which showed the use of a carbon base ink. Beckner testified he customarily used a fountain pen in keeping his records.

Informants, as a part of their case, introduced the transcript of the testimony of the accused before the Advisory Committee at a hearing held in connection with its investigation prior to the filing of the charges in question, as well as the complete file and record entries in the partition suit in question.

Respondent offered two circuit judges, one ex-circuit judge, two members of the Mercer County Bar, and two members of the Grundy County Bar who testified to his good reputation as a lawyer. Five laymen, residents of his county, testified to his good reputation for honesty and integrity.

Taking the stand in his own behalf at the hearing before our commissioner, respondent testified that he was 56 years of age, graduated in law in 1907, and in December of that year started to practice at Trenton; that he was not personally acquainted with Mrs. Smith until she came to his office to see him on May 30, 1936, although he knew of her and knew her father, a respected, elderly citizen of Grundy County, by whom she was accompanied on the occasion just

referred to; that he was well-acquainted with Guy A. Thompson, and during his lifetime had represented him in some matters; that a short time before Thompson's death, he had shown respondent his will—''He pulled it out of his inner pocket here and talked to me about it and I either read enough of it or he told me the contents in substance of the will . . . he said he was leaving Lennie Keith who worked in the Thompson State Bank Five Thousand Dollars and divided the rest of it between Eulah (Drury) and Jennie (Mrs. Smith). That is the way he expressed it . . . he asked if he could record it or if it would be better to have it recorded because he wanted to be sure it was preserved. . . . I told him I didn't know of any law permitting the recording of a will—that he ought to put it away some place where he knew it would be safe.''

He testified that the day Mrs. Smith and her father called on him he was very busy with other matters and did not talk to them to exceed five minutes. In reply to a question asking him to tell the substance of the conversation he had with her at that time he answered, ''This is just roughly, but the best I remember. She came in and after the formal meeting (introduction), she asked me if I had the will of Guy A. Thompson—she didn't say 'Guy A. Thompson' but 'of Guy' and I said 'No, but he had a will.' She asked me about it and I told her that he had come to talk to me a short time before that about recording the will for fear it would be destroyed and she asked something about the contents of it and I explained to her and they said something about me representing her and I said 'Well, I haven't got time to talk to you today—can't you come back the next time you are in town and I will talk to you more fully.' I had some other parties waiting for me in the office and didn't want to go into detail. That was about the substance of the conversation.'' ''The Commissioner: Q. Nothing was said about the marriage in that conversation? A. Well I would not say for sure Judge—either that conversation or the next time I said to her 'Were you married?' and she said 'Don't you know—didn't Guy tell you?' ''

At this juncture, respondent related that on one occasion Orville Smith and one Jim Hamilton came to his office and said something about Thompson having alienated the affections of Mrs. Smith, the circumstances of which he detailed as follows: ''Guy Thompson had always been a very good friend to me personally and it was along in the morning and I said, 'Well, can't you come back in the afternoon?' And when he went out of the office, I called Spickard and called Mr. Thompson and told him to come down there. Just after dinner, when I come in, Mr. Thompson come up the stairs. . . . These two gentlemen came up behind him and I said 'Mr. Thompson, these two men have been up to see me about your taking Mr. Smith's wife from him, and I have not permitted them to tell me about that. I think it is something you folks ought to settle among yourselves.' I

said, 'Go in the front room there,'—I had the entire upstairs there—'and talk the matter over, if you want to,' and they did do that. Later, after they had been in there an hour or so, they called me and Mr. Thompson had written out a check for $1600 to Mr. Smith and asked if that would be alright and I said 'I am not passing on that. Whatever suits you gentlemen pleases me—I am not representing any of you or having anything to do with it.' So I learned afterwards—I didn't know then—but I learned afterwards from Mr. Thompson that he had induced this woman to leave Smith. There is no question about that." So that, as respondent further testified, he purported to know of Thompson's "general relation" with Mrs. Smith because "he had talked to me a number of times before about Jennie and visiting her," and that at the time of the conversation about the will "he said something about leaving her one-half of his estate, and, naturally I thought it was a marriage, the way he said it."

The next time he saw Mrs. Smith was about June 11 when she came again to his office, this time unaccompanied, and it was either at that time or the first time that he asked her if she was married, and she replied, "Well you ought to know—didn't Guy tell you?" He says he then asked her about it, and she told him "they were married on April 8, 1931, and I asked her 'Where' and she said 'At the Court House'—there in Trenton, and I asked her 'Who by' and she told me 'By Judge Drummond' and I asked her about it and she said that Mr. Kavanaugh and Guy made the arrangements, that she didn't know anything about that, but they went down to the Court House at night. I said 'Well, have you got the marriage certificate?' and she said, 'No, Guy took the papers.' I said, 'Well, what do you know about it?' She said 'Well, my folks know about it' and I asked her a little further and I said 'Well, I will draw up a contract and you take it home and let your folks look at it and if it is alright—I will make some investigation and you can bring it back next time you come to town.' "

The foregoing was, in substance, his conversation with her about the marriage.

He further testified he drew up the contract and she took it home, and sometime later, on her next visit to his office which was on June 26, she brought it back; that during that interval he examined the records and found Book 13, page 312, in question, and that it was then in the same condition as at present; that he did not call it to the attention of anybody in the Recorder's Office, but did tell the Recorder, Mr. Kennedy, that he might want to get a book and have some photographs made of it; that when Mrs. Smith came in on Friday, June 26, he asked her about the record, and she said "I don't know anything about that record . . . Guy picked up all the papers and wanted to keep it a secret;" that he told her about the condition of the record, and that he would like to know what Beckner,

the former Recorder said about it; that it was arranged for Beckner to come immediately from Dunlap, his home, some ten miles distant, for that purpose; that he sent an automobile, driven by his son, after Beckner; that when Beckner came to the office, he explained to him, in Mrs. Smith's presence, that he was "making an investigation in regard to this marriage here of Mrs. Thompson and Guy, and I want to know what you know about it;" that Beckner repeated, in substance and effect, what his client had theretofore told him, and that the Hestir-Comella marriage was entered at page 312 temporarily, at Kavanaugh's suggestion, to hold the space for the Thompson-Smith license so the newspapers would not be "bawling him out," and that the return was made out by him and signed by the Justice of the Peace on April 8, 1931; but he didn't regard the return as actually having been made until December 15, 1934, when he got the papers back from Thompson, thus accounting for the appearance of both dates as the date of filing.

The witness testified he "still didn't like the explanation" and insisted on making a photograph of the record; that Beckner volunteered to go with him to the Recorder's Office to see the record as did his client, who also wanted to see the book, and he told them "If everybody goes down there, everybody will know about it—I will go and get it and have it photographed." In reply to the question of the commissioner as to what his objection was to everyone knowing about it, he said, "Well, I wanted to get all the information I could with reference to the matter before I filed suit. You can make an investigation lots better if people don't know what you know about it until afterwards—that is my idea—I may be wrong. I went and got the book and he explained how he had fixed it."

Respondent admitted that he went to the Recorder's Office and, as we understand it, in connection with the taking out Record 13, he also procured some marriage license blanks. His explanation of the purpose in so doing was as follows, "I wasn't familiar with the marriage licenses and I wanted to use them in preparing this case, in trying it."

After getting the record, he estimated it was not in his office more than thirty minutes. He then took it to the photographer's, after which he returned it to the Recorder, all within the course of an hour. It developed later that the photographer made a mistake and photographed the record at the top of the page instead of the one in question, which appears at the bottom. He says he learned the following Monday that the photographer had taken one for the Thompson estate and therefore he didn't have another one taken.

He further testified that at a time he was unable to fix definitely, but prior to June 26, and before the filing of the partition suit, Mrs. Smith's father, Maxwell Morrison, had been in his office and "told me about their being married." As bearing on respondent's good faith

in instituting the suit, and the investigation he made of it, he was permitted to detail his conversation with Maxwell Morrison. In that connection, the record shows the following:

"THE WITNESS: Well, Mr. Morrison said that he got up one morning and seen that Guy was there [in his, Morrison's, home] and had been there all night. He had thought nothing of him being there in the evening before then and keeping company, but when he stayed all night he said, 'Now, wait a minute—what does this mean?' And he said at that time Mr. Thompson said, 'Well, we got married'— as I remember he said 'last night' and he said 'Where?' and he pulled out and showed him the marriage certificate he had in his pocket and Mr. Morrison said he didn't read it over carefully but that he read it in a way, and that Guy told him him and his daughter had been married the night before.

"MR. KITT: Q. What did you say his daughter said? A. He said Guy and Jennie both told him they had been married but wanted it kept secret and didn't want anybody to know about it because Guy's life had been threatened.

"Q. By whom? A. Orville Smith had threatened him several times, . . .

"Q. That is what the old gentleman told you? A. Yes, and the daughter told me, too. That was their explanation as to why they kept it secret.

"Q. Had you heard any rumors in the community that these people had been married? A. There had been more or less discussion about their association together, but I never received—

"Q. Well, just confine yourself to my question. You say you had not heard it? A. No.

"Q. Did you make any further investigations? A. Only to look at the record and see what shape it was in."

Respondent admitted that the investigation referred to (that of looking at the record to see what shape it was in) was not made until after the conversation with Mrs. Smith's father, just detailed. He then "looked up the law on the thing to see what to do, and I discovered that the justice of the peace had to keep a record, so I called Mr. Herndon." After ascertaining that Herndon had Judge Drummond's marriage records he went to the office of Herndon who was busy at the time. "I told him I had come over to look at that record and he handed it to me. I think it was on his desk there, or in a drawer—any way, he handed me the book and I asked him if I could take it over to the office, those people were in there." Herndon consented and respondent took the book to his own office where he says "I turned to it to see if there was any marriage record about the date Mr. Thompson and Mrs. Smith were married, as they had told me, and I didn't find any record and so I throwed it down on the desk in the office and it laid there three or four days;" he did

not notice that any pages were missing because he "just looked at the dates" and denied having removed any pages. He fixed the time of getting Judge Drummond's record as three or four days after June 26, the date Beckner and Mrs. Smith were in his office, and denied that he knew of the existence of such a record as Judge Drummond kept until after June 26. He said he had the book three or four days and started to return it as soon as he learned Herndon wanted it back, but he met the girl from Herndon's office, who had come for it, and he gave it to her.

Respondent testified that at a date not fixed he went to the probate court and got the inventory of the estate and tax appraiser's report, and found some testimony had been taken in connection with the latter; that no further investigation was made in regard to the marriage before filing the suit except looking up the law, because he relied on what Mrs. Smith and her father *and Beckner* had told him about the record. The suit was filed July 6th as stated. The next day thereafter he gave notice to take depositions. He testified he did not see Beckner after June 26 until the evening of July 10, being the night before his deposition was taken, at which time he drove over to Dunlap and told Beckner to come in the next morning to have his deposition taken; that he did not discuss the case with Beckner at that time and "wasn't there two minutes." As part of his direct examination, respondent offered a copy of Beckner's deposition, which was received in evidence. He says he did not see Beckner after his deposition was taken on July 11th until the latter part of August. In the meantime he had learned through a source he did not disclose that Mr. Sawyers and Mr. Lloyd had taken some kind of statement from Beckner at the Plaza Hotel in Trenton, and that the statement was adverse, and so he went to Dunlap and asked Beckner if he gave a statement about the Thompson matter, and Beckner told him no, that they were investigating some W. P. A. work and an insurance case, and that the Thompson matter had not been mentioned. He said the next time he saw Beckner was September 1 or 2 when the other side undertook to take Beckner's deposition; that while the defendant had not notified him of the name of the witness they desired to examine, nevertheless he thought "I knew who it was because they had asked to recall him [Beckner] and I said no the depositions was finally closed, but I would waive notice anytime to take further depositions." He denied having had anything to do with Beckner's refusal to give his second deposition. The first deposition had not been reduced to writing at the time the defendant undertook to take his deposition on September 1 or 2. The deposition was signed September 17th, a week or ten days after it had been transcribed. He testified he did not try to get in touch with Beckner for the purpose of having his deposition signed because he had "insisted on the notary who took the deposition getting it signed up, if he wanted

to sign it. . . . He come to the office himself and I would not talk to him because in conversation I had learned that he had made some kind of statement but I didn't know what it was at that time. I had asked Mr. Hillix for a copy of his statement at the time of taking the deposition, if it was adverse, and he had refused to let me have it." He further testified that at the time Beckner came to his office, he said "Elvin, if it is correct, I would like for you to sign it." To which Beckner replied "There are a few corrections I want to make." He then told Beckner, "Make any corrections you want to but leave it so it can be read—but if it is true sign it. . . . Take this copy and if you sign it, sign the copy so I will have them, myself." He then directed the witness to the office where the original deposition was and instructed the notary as follows, "Let him make any corrections he wants to, have him read it over carefully, and then swear him and have him sign it, if he says it is correct." The "corrections" made by Beckner in his deposition consisted of changing the date of his writing in the names of Thompson and Mrs. Smith from "a week or ten days after the 8th of April when they got their license" as originally testified by him to "December 15, 1934," and to show that the first date referred to his having written their names on a piece of paper as a memorandum rather than entering the same of record.

Respondent further testified that the first time he saw or actually had a copy of the statement given to Sawyers was sometime after September 19, 1936, which was the date of the informal hearing before the Advisory Committee in this cause, when a copy thereof was filed with a motion to quash the deposition of Beckner in the circuit court of Sullivan County, where the partition suit had been sent on change of venue. On May 7, 1937, respondent filed a motion to strike the motion to suppress, which was overruled, and respondent thereupon dismissed the suit, and later served written notice on his client of his withdrawal from the case. His explanation of that dismissal was that in talking with Mrs. Smith he told her, "With these proceedings pending, I can't properly represent you. Neither am I going to be in a case where there is any question about it. I will dismiss this suit and withdraw from it and if you want to get somebody else and can get somebody else, it is perfectly all right with me." He testified that the dismissal was with the consent of his client. In talking with his client and her father he further said, "Now listen this thing has got in this shape and I am not going to go on with it and I want permission to dismiss the suit and withdraw from the case." To which his client replied, "Well I have lived this long without their help or money, I guess I can continue to."

Respondent denied having changed or suggesting that the marriage records be changed; that he had not previously had any close relations with Beckner; that he had known of him since 1928 but never knew him until he made the race for Recorder; that most of the business

he transacted at the Recorder's Office was with Beckner's deputies. He further testified as to the location of his office and that it would be impossible, on account of the physical surroundings, for a person in his private office to change a record without being in full view of other persons in his office. He also contended that he always had two or three kinds of ink in his office.

Turning, now, to the cross-examination of respondent, it was developed that his contract provided that he should receive 50% of whatever sum his client might recover from the estate which he estimated to be worth approximately one-half million dollars, and that upon Mrs. Smith's very first trip to consult him, he supposed she was seeking to recover a half interest therein, or about $250,000; that notwithstanding the fact he had never had a piece of litigation involving such a large sum of money, and he had seen, and knew the contents of Thompson's will under which Mrs. Smith would receive approximately a quarter million dollars, he was too busy to discuss the matter with her and her father, and requested that they return at some later time (they lived 25 miles away); that he regarded it as not "surprising" but "rather unusual in one way and in another it wasn't" for her to wait eight months after the death of Thompson before making any inquiry about her rights as the widow. His explanation was that Mr. Morrison told him that "after Guy died, Jennie was sick and was not able to do anything, and they kept thinking that the papers would show up, which would explain the whole thing and they would not have to do anything."

In connection with the character of investigation made by respondent before filing suit, he admitted he knew that if the will or an admittedly genuine marriage record were found, he would receive approximately $125,000, without further labor on his part. Notwithstanding this fact, he did not go to the probate court, or any other court, for the purpose of making an investigation, until after his contract had been signed, which was on the occasion of the third visit of Mrs. Smith to his office. His explanation of his failure to go to the probate court and ascertain whether a will had been filed was that he was "convinced in my own mind that no will had been filed there because I would have known of it if it had been and they would have known of it." Nor did he talk to Mrs. Drury, the administratrix, or to any other person representing the estate to ascertain why his client had not been paid—this because of hostility on the part of Mrs. Drury toward his client. He did not discuss the matter with the probate judge to ascertain whether any claim had been made by Mrs. Smith, or whether any will had been attempted to be admitted to probate, because Morrison and Mrs. Smith told him they had never filed a claim and he took their word for it, nor did he know whether any other will had been admitted to probate. He did not seek to examine the "file book," or record of instruments

deposited for recording, although knowing such a record was kept, nor to ascertain whether the marriage certificate itself was on file, or whether there was any other record of such a ceremony having been performed. He made no effort to contact any member of either Judge Drummond's or Mr. Kavanaugh's family to ascertain whether they had received any word of the purported marriage. He made no inquiry of the then Recorder or his deputy either before the suit was filed or even after he had seen Beckner's statement to Mr. Sawyers, as to whether, in going over the records, either of them had ever noticed the altered records; that although he knew no will of Thompson had been probated, he did not feel under any obligation, during the eight months following Thompson's death to tell Mrs. Smith of the existence of a will under which she would receive one-half the estate. This for the reasons, first, that "it didn't occur" to him to do so; and second, because Mrs. Smith lived at a distance of 25 miles from Trenton. Furthermore, when he testified before the committee, he said when he went to the Recorder's Office to check the marriage records, he did not consult the indexes. (This would have revealed nothing, as heretofore pointed out.) His testimony was, "I didn't even look at the index. I looked first in Book 12 as to the date—April 8th, 1931—and seeing that it was not in number 12, I looked in Book 13 and turned to it just from the date." The following question was put to respondent on cross-examination, and he made the following reply: "Q. I understand you have never reached a conclusion whether this is a forged or a genuine record? A. No, that has not been clear to my mind yet. One day I think one thing and another day I think another."

It appears that a deed from Guy A. Thompson to his sister, Eulah T. Drury, purporting to be dated May 24, 1933, and conveying Thompson's real estate, together with bill of sale to his personalty were filed for record subsequent to his death. These instruments were alleged in the petition filed by respondent in behalf of the alleged widow to be fraudulent and without consideration. Respondent's position before the Bar Committee was that they were forgeries, or at least he declared them to be such, but offered no other proof in support of his contention. Respondent pictured Thompson as being very secretive with respect to his affairs; that it was characteristic of him not to want anybody to know about any of his business; that particularly, he had a penchant for keeping instruments off the record and away from public view, as demonstrated by his habit of carrying valuable papers on his person, such as chattel mortgages and deeds of trust for which he had collected filing and recording fees, and would turn them back when paid off without ever having filed or recorded them.

Maxwell Morrison was called on behalf of respondent and he repeated in substance and effect what has been heretofore set out in connection with the testimony of respondent in relation to finding

Thompson in his daughter's bedroom and Thompson's statement in consequence thereof to the effect that they were married the night before. It should be added, however, that the recollection of the witness generally was exceedingly faulty. He was unable to fix the date of the occurrence just referred to with any degree of accuracy. He first fixed it as not more than six months to a year before Thompson's death, which, it will be recalled, was September 24, 1935. Later he professed not to know the exact time but was satisfied it was not more than three years prior to the date of Thompson's death, and finally, on re-direct examination, could not remember "whether it was a year, two years, three years, six months or two months" before the death of Thompson. He further testified that he never disclosed the fact that Thompson and his daughter were married, although he knew it was rumored in the neighborhood that they were on terms of intimacy, and some of the neighbors knew Thompson was spending nights at the Morrison home with Jennie. He also testified that he knew a wife automatically inherited some part of her husband's estate, but that he took no action and urged his daughter to take no action until some eight or nine months after Thompson's death. He contradicted respondent as to the extent of his consultation on the first visit, saying they were there about thirty minutes and went into the matter somewhat fully, and that he disclosed that they had been in Mr. Platt Hubbell's office that day and had signed a contract, and that respondent demanded a release from Mr. Hubbell before he could accept the case. Nothing was said on that day about the marriage of his daughter to Thompson.

Orville Smith, the ex-husband, testified on behalf of respondent to the effect that he met Thompson in the summer of 1935, on the road between Modena and Trenton, at a place where the witness could not get through the road on account of mud; that Thompson drove around him and stopped; that previously he had made threats against Thompson; that he told Thompson "I ought to get even with you," to which Thompson replied "that him and Jennie was married. . . . I have got the papers to show it." Smith then said "If you have, all right; go ahead and take care of her." He denied he accepted Thompson's $1600 check tendered in settlement of his claim for alienation of his wife's affections. On cross-examination, this witness said that from the date of his divorce in 1921 until the conversation in 1935, above detailed, he had never seen and talked to Thompson; that he did not thereafter tell any person of the conversation because he wanted to keep it as quiet as possible, thinking it reflected more on him to have people think Thompson and his ex-wife were married than to have people think Thompson was living with his former wife without marrying her. There was no pretense that respondent knew of the purported conversation between Thompson and Smith at any time before or during the pendency of the partition suit.

In rebuttal, Mr. Sawyers testified that respondent, accompanied by a bellboy or the manager, came to the room in the Plaza Hotel where he was taking the statement from Beckner, and one of them, in the presence of the other, demanded to see Beckner, which was refused.

We think the facts and circumstances reflected by the foregoing statement, together with others presently to be noticed, lead inevitably to the conclusion that the charges have been sustained not only by the preponderance or greater weight of the credible evidence, which is all that is required, but they go beyond this, and are deemed sufficient to satisfy the rule in criminal cases, requiring proof of guilt beyond a reasonable doubt. In this view of the case, it becomes unnecessary to inquire into those exceptions to the Commissioner's report wherein complaint is made with respect to the exclusion of certain testimony offered on the part of informants.

Respondent's testimony before the committee is in sharp conflict in many respects with that given by him at the hearing before our special commissioner. We shall not undertake to enumerate the many contradictions, but the following are examples:

Before the committee he testified that he got the record out of the Recorder's Office and took it to his own office before Beckner's arrival there. Whereas he now says he went to get the record after Beckner came to the office. Before the committee he said he noticed some pages were missing from Judge Drummond's record, bearing date "during 1931," and on this trial he insists he did not make any such discovery.

Before the committee it was his position that he refused to contract with Mrs. Smith until she had been released by Mr. Hubbell, and on the present trial he first claimed that he did not know of Mr. Hubbell's contract until after the suit was filed, but even this he finally changed by saying he knew of the Hubbell contract after his own contract was signed, but before suit was filed.

He admitted he did not divulge to the committee in its investigation that Morrison had told him his daughter was married, although he (respondent) testified before the committee at great length, and produced numerous affidavits and character witnesses in an effort to forestall the filing of these charges, nor, of course, did he have Morrison testify before the committee. He attempted to justify his failure to do so by saying "I didn't think that any evidence would do any good."

He was insisting before the committee that Beckner was wholly unreliable, as disclosed by the following: "Q. Was he considered reliable? A. No, no; absolutely not. Q. You don't consider him worthy of belief? A. No, I don't; and didn't at any time. . . . Q. And Beckner you would not believe? A. No, I don't believe him, because I think he is wholly unreliable, and I think anybody else would tell you the same thing. Q. Did you think his explanation

about these records would be unreliable, too? A. Yes. I think anybody can take some money and make him say anything. I think he will make any kind of statement you want—and that he is wholly unreliable.'' (Italics ours.) This is in contrast to his present position that the unreliableness of Beckner was confined, in the main, to his financial affairs.

Before the committee he stated he drew up the contract and had Mrs. Smith take it home with her, saying, ''I would not let her sign it until her father looked it over. *I was taking abundant precaution on the thing.''* (Italics ours.) This in the face of his admission that at that time he had not investigated the state of the record, and for aught that appeared, there was nothing irregular about the marriage and he had no cause to believe there would be a contest, but nevertheless negotiated a contract which would have netted him approximately $125,000.

It should be stated that an inspection of Judge Drummond's record of marriages shows that he invariably signed his name as ''*John T.* Drummond'' instead of ''*J*. T. Drummond'' as it appears in the altered record in question. This we note in connection with Beckner's deposition, where under pressure of cross-examination as to when he had inserted the words and figures ''15'' and ''December,'' he made a disclosure not in anywise evoked by the question propounded, as follows: ''I didn't know how Mr. Drummond signed his name; he was dead at the time.'' It will be observed, too, that in the justice's certificate in the altered record the word ''Justice'' (of the Peace) is misspelled, the ''e'' being omitted. Every record of a marriage performed by Drummond, and as kept by him in his record herein referred to, shows the words ''Justice of the Peace'' are in every instance in the same handwriting as his signatures, and in no case was the word ''Justice'' misspelled.

The informants do not contend that Beckner's statement to the Assistant Attorney General should be considered as having any substantive or independent testimonial value, but on the contrary concede it should not be treated as any direct evidence that the record of the alleged Thompson-Smith marriage was caused to be forged by respondent or knowingly made use of by him with the knowledge that it was a forgery. However, the statement was admissible not only for impeachment, but as a circumstance to be considered in connection with the conduct of respondent after admittedly having knowledge of the charges made against him in the statement. His failure to demand an explanation from Beckner after learning the contents of the statement was on this ground: ''I didn't talk to him because I was afraid to talk to the fellow, to be frank with you, and I think I talked to him only once and he told me then that the statements that Sawyers got were not his answers. . . .'' As pointed out, he made no investigation thereafter in an effort to corroborate Beck-

ner's story on which he had relied in filing the suit, although certain avenues were open to him for that purpose.

 Mrs. Smith was not produced as a witness, although respondent's counsel in his opening statement said, "I will call Mrs. Smith, because the fact of the marriage has been disputed." Doubtless to the surprise of counsel, respondent while on the stand, testified in that connection as follows, "I have never been able to subpoena her. Her mother has cancer in the throat and she has taken her to Kansas City to give her radium." But Maxwell Morrison, who followed respondent on the witness stand, in response to questions propounded by respondent's counsel touching the whereabouts and condition of his daughter, testified as follows:

"Q. Where is your daughter now? A. She is at Trenton.

"Q. Do you know what the state of her health is? A. It is bad. She has heart trouble.

"Q. When did you see her last? A. I saw her this morning.

"Q. It is reported to you that she has heart trouble—did you ever talk to the doctor? A. Yes, sir.

"Q. Doctor who? A. Dr. Cullers.

"Q. And it is reported to you that she had heart trouble? A. Yes, I know she has it. I have seen her when she has been sick with it."

We think it quite significant in view of the contradictory nature of these statements that respondent did not request, and, indeed, demand that the hearing be continued over for the purpose of permitting him to produce his former client, and most important witness. The inference to be drawn from his failure to produce his former client under the circumstances detailed is that her testimony would have been unfavorable to him. Application of this rule is found in such cases as Chavaries v. National Life & Accident Insurance Co. (Mo. App.), 110 S. W. (2d) 790, wherein it was said: "Now the term 'available,' in the sense in which we are using it, does not mean merely available or accessible for the service of a subpoena, since any witness who can be found may be subpoenaed at the instance of either party to a cause. To the contrary, the question of whether a witness is 'available' to one or the other of the contending parties depends upon such matters as the one party's superior means of knowledge of the existence and identity of the witness, the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case, and the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation, and make it natural that he would be expected to testify in favor of the one party and against the other. In other words, a witness may be said to have been peculiarly 'available' to one party to an action, so that upon the party's failure to have produced him in court an inference will arise that his testimony

would have been unfavorable, when, because of such party's opportunity for knowledge of or control over the witness, or the community of interest between the two, or the prior statements and declarations of the witness, it would be reasonably probable that the witness would have been called to the trial to testify for such party except for the fact that it was either known or feared that his testimony on the stand would have been damaging rather than favorable.'' None of the circumstances present in the Parkinson case, 344 Mo. 715, 128 S. W. (2d) 1023, wherein we refused to apply this doctrine, are present in the case at bar.

We entertain no doubt that if the discovery, many months after Thompson's death, of the accidental duplicate recording of the Hestir-Comella marriage had not been made, no claim would have been asserted that Mrs. Smith was Thompson's widow. If this is not so, it is unbelievable that she would have consented to the dismissal of her suit, or abandoned her efforts to have her rights established, to say nothing of respondent suffering it to be done. No effort was made to explain away the telltale flecks of carbon in the ink used in making the alteration. The expertising of the records corroborates Beckner's testimony that in keeping his records he used a fountain pen, and serves as an important link in the chain of circumstantial evidence leading to the conclusion that respondent caused the record to be altered, as charged, and that it was done in his office. It would serve no useful purpose to set forth the construction placed by us on each of the many sets of facts and circumstances touching respondent's employment, investigation, filing, conduct and dismissal of the suit. The facts have been narrated and they speak for themselves. His testimony is impeached by its own contradictions, and the mass of incriminating and undisputed circumstantial evidence is so convincing that we are impelled to the view that his conduct was not in good faith, but was a deliberate and sustained attempt to perpetrate a fraud by the means charged, for which he should be disbarred. It is so ordered. All concur.