In re Mary Carmen SPEISER.

No. 29330.

St. Louis Court of Appeals.

Missouri.

Oct. 16, 1956.

Bernard J. Mellman, St. Louis, for respondent.

Milton Yawitz and Clifford Greve, St. Louis, for informants.

PER CURIAM.

This is a disbarment proceeding instituted in this court pursuant to leave, by members of the Eighth Judicial Circuit Bar Committee, informants, against Mary Carmen Speiser, respondent, a member of the Bar of Missouri, who maintained her office in the City of St. Louis, Missouri. Following the filing of the information, the Honorable R. Jasper Smith, a member of the Missouri Bar, was appointed as Special Commissioner to hear, transcribe, and return to us all testimony and evidence taken by him, with his findings of fact and conclusions of law.

The information charged respondent with professional misconduct directly or indirectly resulting from her representation of three different clients.

The first charge grows out of respondent's conduct in relation to one Mrs. Margaret Patterson who sustained personal injuries in a bus accident. The information alleges that after Mrs. Patterson's claim was settled, respondent represented in writing that out of the proceeds of the settlement she had paid certain bills of Mrs. Patterson, when in fact such bills had not been paid by respondent. It is further alleged that respondent had failed to apply the sum of $318.56 toward the purchase price of a dwelling purchased for Mrs. Patterson as represented by respondent in the settlement statement; that respondent had failed to account to Mrs. Patterson for the amount due her from the settlement of the personal injury claim; that subsequent to the settlement respondent unlawfully took possession of a lot of household goods belonging to Mrs. Patterson, removed them from the latter's residence, and failed to account therefor.

It is next charged that on or about April 22, 1953, respondent was paid the sum of $400 as an attorney's fee for certain services to be performed for Edgar Earl Gossett, which she agreed to return to Leon B. Causey, who had paid the $400, in the event she did not keep Gossett free and clear from charges in one of the criminal courts in St. Louis, Missouri; that Gossett was not kept free of charges but respondent failed to return the $400 to Causey; that she misrepresented certain material information to Gossett relative to his being cleared of such criminal charges, and that she represented that she used certain portions of the money so paid to her for the purpose of paying off various people.

The final charge is that on or about the 16th day of June, 1953, respondent was employed as an attorney in a divorce suit by one Mary Prosperito, who paid respondent a certain amount as attorney's fee and court costs under an agreement that she would refund to said client the fee and costs paid to her when appropriate payment had been received by respondent from the husband of her client; that in fact she did receive payment from Mary Prosperito's husband, but failed to refund the attorney's fee and court costs paid to her by her client.

In general, in connection with the three specific charges, respondent is accused of appropriating money of her clients and failing properly to account to them contrary to her professional duties; that she made representations unbecoming to the ethics of her profession; and that her behavior was such as to bring shame and discredit upon the profession.

Respondent's answer denied generally all of the charges of professional misconduct complained of in the information, and requested dismissal of the charges.

Shortly prior to the date on which the hearing was scheduled, counsel for respondent made inquiry of one of the attorneys representing informants to deter-

mine· "whether or not it 'was possible to consider a suspension in this matter, rather than a disbarment". This resulted in an understanding that a recommendation would be made that respondent be suspended from the practice of her profession for a period of one year. At the outset of the proceedings before the Commissioner the recommendation was made by counsel for the Bar Committee. The attorney representing respondent concurred in the recommendation as demonstrated by these remarks:

"I presume we are in a position legally of not contesting the charges of the Bar Committee * * *. I do believe sincerely that perhaps the purpose of the institution of these proceedings; that is, to uphold the integrity of the Bar, will be subserved by the Court's and the Commissioner's recommendation and the approval of the suggestion made by the Bar Committee. I think that it would be a terrible hardship on Mrs. Speiser to be completely disbarred, and permanently disbarred, and I think that the period suggested by the Bar Committee although, of course, it will be a hardship at her age, will not be easy for her at the conclusion of the year to start in the law practice again. But I have discussed the matter with her seriously and sincerely, and I do believe that, as I say, the purpose of the institution of the Bar Committee's proceedings will be served and promoted by the approval of their recommendation. That's all I have."

Because of this turn of events no witnesses were heard by the Commissioner, but the matter was submitted on the record of the proceedings of the Bar Committee during the numerous hearings which it conducted prior to the time of filing of the information in this court. All exhibits presented to the Committee were filed as a part of the record. In addition a lengthy statement was made to the Commissioner by respondent's attorney, intended and designed to explain respondent's conduct and mitigate the charges. The parties stipulated that if the witnesses referred to by respondent's counsel were present, they would testify as outlined in the statement made in behalf of respondent. This stipulation extended to the testimony that respondent herself would have given. In this state of the record the matter was submitted to the Commissioner, who, after due consideration, filed his report, wherein he found the evidence did not warrant a finding of professional misconduct as to the first (Patterson), and second (Causey) charges. As to the third complaint, the Commissioner found "that there was misappropriation of client's (Mrs. Prosperito) funds, and hence professional misconduct in this instance". Being of the opinion that there was no showing of "intentional fraud or misconduct on the part of respondent", the Commissioner recommended "that upon full restitution to Mary Prosperito", respondent be publicly reprimanded by this court.

In time the Bar Committee filed exceptions to the report of the Commissioner.

■ The findings and conclusions of the Special Commissioner, while helpful, are advisory only and not binding on us. To the contrary, we must review the record de novo and make our own findings of fact and conclusions of law. In re Parkinson, (en Banc), 344 Mo. 715, 128 S.W.2d 1023; In re Kaemmerer, Mo.App., 178 S.W.2d 474; In re Mason, Mo.App., 203 S.W.2d 750, certiorari granted, see State ex rel. Morton v. Cave, 359 Mo. 72, 220 S.W.2d 45.

We now consider the facts:

Patterson Case.

■ In 1946 or 1947, Mrs. Margaret Patterson was injured as the result of the occurrence frequently referred to in the record as the Belleville bus accident. Respondent was employed to represent her under a contract providing that respondent

would receive one third of the amount realized for the client. In time respondent settled Mrs. Patterson's claim for $750. Mrs. Patterson stated she received the following undated statement from respondent:

"Belleville Bus Settlement

| | | |
|---|---|---|
| Total Settlement | | $750.00 |
| Hospitalization | $116.40 | |
| Christian Hospital | 17.50 | |
| Ambulance Service | 20.00 | |
| Medical Expenses | XXXX | |
| Attorney's Fee.. ⅓ | 250.00 | |
| | $403.90 | |
| Glasses | 22.44 | |
| Eye Doctor | 5.00 | |
| | $431.34 | |
| Balance Due Client | | $318.56 |

$318.56 applied on the purchase price of house plus 100.00 dollars earnest money makes a total of $418.56 invested in the house at 3743 Lincoln.

The bills above not paid will be paid by me. Send me the bill from the eye doctor. Save all repair bills for the house. I will need them for income tax purposes. If you do not get a bill, make a list of things bought and the price. I called Mr. Zeppenfeld, he is going to contact Sophia to refund the rent also the 20.00 for the articles taken. Give Bill all the mail, Mr. Zep. will forward it. Use the insurance check for food and I will pay the full hospital bill." 

Mrs. Patterson, with much insistence, contended at the hearing before the Bar Committee that she received no part of the settlement of her claim—"I never saw a penny of it." She did admit, however, that the items of $17.50 to Christian Hospital, $20 for ambulance service, and $14 (not $22.44) for glasses had been paid by respondent. (These items resulted from Mrs. Patterson's injuries.) But Mrs. Patterson did not complain because of not receiving the amount due her as shown by the settlement statement. The burden of her complaint was that respondent had

failed to apply the amount of $318.56 on the purchase price of a five-room dwelling at 3743 Lincoln Avenue, St. Louis, Missouri, and had failed to pay her hospital bill in the amount of $116.40. She testified that pursuant to an oral agreement with respondent the latter had agreed to buy said property; that in August, 1948, believing the purchase had been consummated for her, she took possession of the dwelling and occupied three rooms thereof and rented the other two rooms. It is clear that the rental income or a substantial portion thereof collected by Mrs. Patterson was turned over to respondent. Mrs. Patterson's testimony as to whether it was to be applied toward payment of balance of purchase price of property or as rent for the three rooms she was occupying is not clear. Since no charge of misconduct is presented with respect to such income, we need give no further consideration thereto.

Turning to respondent's theory of the disposition of the proceeds of the settlement of the personal injury claim, we find that, quite contrary to the representation contained in the settlement statement, admittedly prepared by respondent, she insisted before the Bar Committee on April 10, 1953, that with the $318.56 she had paid Mr. Patterson's hospital bill, or delivered that amount directly to her client. Her version of the transaction is clearly demonstrated by the following excerpts from her testimony.

"Q. Did you apply $318.56 towards the purchase price of that house? A. No, sir, that went to her husband's hospital bill.

"Q. That belonged to Mrs. Patterson? A. Yes, sir.

"Q. And you say that wasn't applied? A. No, sir, it went to his hospital bill.

\*    \*    \*    \*    \*    \*

"Q. Now in here it states that there was $318.56 applied on the purchase price of the house, plus $100 earnest

money, making $418.56 invested in the house at 3743 Lincoln. Now did that mean that you had used $318.56 of this woman's money to invest in that house? A. No, sir.

"Q. Now tell us what you did mean when you gave her this statement showing that there was a balance of $318.56 due her and that $318.56 had been applied to the house, and there is nothing in here indicating that there was any check transmitted with this to cover the amount that was due her? A. That money was paid for the—I call him 'Dad'—Mr. Patterson, I called him Dad. That was used to pay for his hospital bill.

"Q. If you used that $318.56 to pay Mr. Patterson's hospital bill, why didn't you state that in your settlement? A. I didn't know it at that time. Do you want me to get a receipt?

"Q. No; the question is this: You had it at that time because you had the $750 check in the settlement of the case? A. Yes, sir.

"Q. Now you had all the proceeds of the settlement, minus the expense that you said you were going to pay? A. Yes, sir.

"Q. And there was a balance of $318.56 due her on the settlement? A. Yes, sir.

"Q. You wrote her this statement showing $318.56 was applied to the purchase price of the house? A. Yes, sir.

"Q. Was it applied? A. No, sir.

\* \* \* \* \* \*

"Q. Then what did you do with the $318.56? A. I gave her the cash with my son—

"Q. You gave her the $318.56? A. If I am not mistaken I gave her three hundred.

"Q. You didn't pay her husband's hospital bill? A. She was supposed to pay the hospital with it.

\* \* \* \* \* \*

"Q. You didn't set up in your statement to her that you deducted and retained this $318.56 to reimburse you for money you had expended for her husband and ask for it and she refused? I am talking about the settlement statement. A. No, sir.

"Q. Why didn't you do that? A. I should have. I didn't, but I should have."

Although it is impossible for us to reconcile the utterly inconsistent positions of respondent respecting disposition of the amount of $318.56, it does appear from a careful analysis of her whole story before the Bar Committee, as supplemented by the testimony she would have given before the Commissioner, that she was relying upon the assistance, financial and otherwise, furnished Mrs. Patterson and her family over a period of several years prior and subsequent to the settlement of the Belleville bus accident claim, to establish that she had not intentionally violated her professional duties toward her client. In short, her position before the Bar Committee and Commissioner was that while she may have been guilty of ineptitude in her method of the handling of Mrs. Patterson's case, she had not intentionally done any wrong, hence was not subject to drastic disciplinary action. A painstaking examination of the record reveals that she based her claim to lenient treatment largely upon the following events:

In late 1947 or 1948, Mrs. Patterson was served with an eviction notice because of nonpayment of rent. Respondent intervened in her behalf and arranged with the constable for a stay of execution until the Pattersons could find a place to live. As the result of respondent's efforts, the Pattersons moved into property on Grandel Square in St. Louis. Thereafter respond-

ent negotiated for the purchase of a home for the Pattersons on Garfield Avenue, and Mrs. Patterson advanced $100 as earnest money which was subsequently forfeited. It was agreed that if respondent found a desirable home she would purchase it for the Pattersons and take and hold title until the Pattersons had acquired funds to re-imburse respondent, at which time title would be transferred to them. The prop-erty on Lincoln Avenue was purchased by respondent, and as stated the Pattersons took possession thereof, occupying a por-tion themselves, and renting the remaining two rooms. The respondent at no time de-nied that the title to the property on Lin-coln Avenue was taken in her name. She insisted, however, that she was willing to convey the property to the Pattersons upon being reimbursed for the amount which she paid at the time the transaction for the purchase was completed.

During the time the Pattersons were liv-ing in the Lincoln Avenue property, and in July, 1949, Mr. Patterson sustained an in-jury while working, from which he died. Through the efforts of another lawyer to whom the matter was referred, Mrs. Pat-terson's claim, filed under the Missouri Workmen's Compensation Law, was settled some time during the year 1951. Thereup-on respondent suggested that Mrs. Patter-son take over the property by paying to respondent the amount she had invested therein. Mrs. Patterson refused. There-after respondent negotiated for transfer of the Lincoln Avenue property as a partial payment on a flat subsequently acquired by respondent. Mrs. Patterson remained in the Lincoln Avenue property following the death of her husband until December, 1951, when she went to DuQuoin, Illinois, be-cause of illness, leaving her furniture in the dwelling. Subsequent thereto the new pur-chasers of the Lincoln Avenue property de-manded possession. This brought about ef-forts on the part of respondent to locate Mrs. Patterson, who had failed to advise respondent that she had gone to DuQuoin. In February or March of 1952, respondent, accompanied by a policeman whom she had called, forced open the doors to the dwell-ing and discovered furniture therein, and mail scattered about addressed to Mrs. Pat-terson. The furniture was removed at the instance of respondent, and stored with Baker Storage Company in St. Louis, who was advised that the property belonged to Mrs. Patterson. Shortly after that turn of events Mrs. Patterson, accompanied by her niece, appeared at the office of respondent and complained about the removal of the furniture from the Lincoln Avenue proper-ty. At that time respondent informed her where the furniture was stored, and ad-vised that it could be obtained upon paying the storage fee.

The learned Commissioner concluded and found that because of the assistance Mrs. Patterson and her family had received at the hands of respondent, there came into existence something more than the normal attorney-client relationship, and because thereof respondent's actions in the disposi-tion of the proceeds of the funds derived from the settlement of the Patterson claim did not constitute professional misconduct, rather it resulted from "professional in-eptitude". Although it is obvious that re-spondent did perform services for, and ren-der financial assistance to, the Patterson family, the conclusion is irresistible that she is nevertheless guilty of professional mis-conduct with respect to the item of $318.56. Her own testimony on *April 10, 1953*, fore-closes a contrary finding. Then she said the $318.56 had either been used to pay a hospital bill of her client's husband or had been paid directly to client. She did not contend then or ever that the amount in question had been applied toward Mrs. Pat-terson's indebtedness to her (if indeed there was one). And it should be said that al-though afforded ample opportunity by the Bar Committee to produce tangible evi-dence of payment of the $318.56 to her client or in her behalf, and although she and her then counsel gave repeated assur-ance that such evidence would be forth-coming, it was not, and finally she stated,

somewhat in desperation, that the Patterson file had been burned. In her words, "We burned the works."

With respect to the charge that respondent unlawfully took possession of and removed the furniture belonging to Mrs. Patterson, we do not believe that the action by respondent in regard thereto constituted professional misconduct, and consequently find against informants on that charge.

With regard to the item of $116.40 characterized in the settlement statement as "Hospitalization", we agree with the Special Commissioner that this item was not paid by respondent. Mrs. Patterson testified that two or three months prior to her appearance before the Committee on February 6, 1953, she had received a demand for payment from St. Elizabeth's Hospital in Belleville, Illinois. A representative of that institution was prepared to testify before the Commissioner that the bill remained unpaid. Although respondent's position was that she had discharged the obligation, we cannot accept her testimony because it stands alone without documentary support, and in the face of conclusive proof to the contrary. The net result is that respondent misappropriated this amount of her client's funds. The Commissioner suggested that respondent's conduct in this instance "affords a technical basis for misappropriation of funds, except as it may be balanced or at least explained by the nature of the relationship existing between respondent and Mrs. Patterson". Such conclusion is hopelessly in conflict with respondent's own theory. She did not seek exoneration on the basis of giving credit on some claimed indebtedness of Mrs. Patterson. Her unequivocal position before the Bar Committee and the Commissioner was that the bill had been paid.

### Gossett Case.

On March 19, 1953, Leon B. Causey, nephew of Edgar Earl Gossett, employed respondent in connection with the arrest of Gossett on a charge of larceny filed in one of the criminal courts in St. Louis, Missouri. From Causey's testimony before the Bar Committee it appears that on that date, he, Gossett, and respondent were in court. Around three or four o'clock, and after having been informed by respondent on several occasions during the day that "she was getting the papers straightened out on the case", respondent advised Causey and Gossett that he (Gossett) "was free and clear to go". At that time Gossett lived in the State of California, and in order that he could return to his home, respondent gave Gossett a statement in writing which reads as follows:

"This is to certify that Edgar Gossett is free from any authorities in St. Louis, Missouri.

"Carmen Speiser,
722 Chestnut
Ce 2020
"Atty. as of March 19, 1953."

Thereafter respondent kept insisting that Causey pay her the fee of $400 which apparently had been agreed upon. Because of some apprehension on the part of Causey, he was reluctant to pay the $400 until he had more definite assurance that his uncle had been completely cleared of any charges. He made the suggestion that he would assign to respondent a receipt which disclosed that he had paid a bonding company $500 for signing Gossett's appearance bond. Respondent accepted this offer, and gave to Causey a statement reading as follows:

"Recd. of Leon Causey a bond of $500.00
$400.00 for me
$100.00 left for
Leon

"C. Speiser,
722 Chestnut St."

This transaction took place either on the day of the issuance of the certificate by respondent hereinabove set out or the day following. On several occasions thereafter respondent contacted Causey and demanded the $400. Finally on the 22nd of April,

1953, Causey went to the office of Dr. A. M. Krall, respondent's uncle by marriage, where he met respondent and discussed the matter further with her. Causey told respondent he was prepared to pay the $400 provided he could have some assurance that she would keep working on the case. Thereupon respondent wrote the following receipt which was given to Causey in exchange for the $400:

"4/22/53

"Received of Leon B. Causey four hundred dollars ($400.00) for attorneys fee in keeping Edgar Earl Gossett free and clear from charges as accused in Division I of Criminal Court in St. Louis, Missouri. In the event I fail said four hundred dollars ($400.00) will be returned to above named Mr. Causey.

"Carmen Speiser."

On the back of this paper respondent wrote the following:

"Said Mr. Gossett to be released during the week beginning May 4, 1953.

"Carmen Speiser,
722 Chestnut
Ce 2020
3209 Dodier
Lu 5686
St. Louis, Mo.

Witness:
Dr. A. M. Krall."

It was Causey's complaint that inasmuch as his uncle had not been kept free and clear from a criminal charge, respondent should have returned the $400 to him in accordance with what he insisted was the agreement and understanding at the time he paid her the fee. On the other hand, although respondent never offered the Bar Committee any explanation for giving the two documents, she was prepared to testify before the Commissioner that the receipt for $400 did not express the true understanding between the parties. Her position was that she had agreed to represent Gossett, not for the purpose of preventing the

lodging of a formal charge against him, but to keep him out of the penitentiary.

We are confronted with some difficulty in resolving this question. The receipt is consistent with Causey's version of the agreement. And such document, fortified by Causey's story, is indeed rather persuasive evidence that respondent was guilty of unprofessional conduct. But consideration of all the circumstances leads to the conclusion, as entertained by the Commissioner, that the conduct of respondent does not call for disciplinary action. Of primary importance is the fact that when the receipt or document relied upon was given, a criminal charge was pending against Gossett. He had previously been represented by another lawyer who had withdrawn from the defense of his case. It is hardly conceivable that Causey and Gossett were unaware of the pendency of the charge at the time they retained respondent. Having such knowledge, we cannot say that Causey had the right to rely implicitly on the statement contained in the receipt. Further, it is clear that Gossett was required to return from California on several occasions because of the pending proceedings. On June 1, 1953, he entered a plea of guilty. Sentence was suspended to September 22, 1953, for the purpose of an investigation in connection with an application for parole, which was granted and from which Gossett was later discharged. During that time respondent was active in behalf of Gossett, and the record justifies the assumption that Causey was fully cognizant of what was transpiring. At no time did he call respondent to task or demand return of the $400 because of her failure to fulfill what he contended before the Committee was the agreement. It is likewise significant that Gossett reimbursed his nephew to the extent of $200, or one half the fee paid to respondent. To that extent, of course, he was financially interested in the transaction. The record fails to indicate, however, that Gossett at any time lodged any complaint with respect to the amount he paid, or the ultimate

result obtained for him in the criminal case. We hold that consideration of all the attending circumstances supports the contention, as asserted by respondent, that the only contingency attached to her employment was to keep Gossett out of the penitentiary, and not "free and clear from charges".

While we find that informants failed to sustain the burden of proving professional misconduct in this instance, we nonetheless feel that respondent's manner of dealing with Causey was far from exemplary. Although the respondent was fully clothed with the right to undertake to represent Gossett, Supreme Court Rule 4.05, 42 V.A.M.S., she was under complusion to make an effort to obtain full knowledge of her client's cause before advising thereon, Supreme Court Rule 4.08. If respondent knew, as a prudent investigation would have disclosed, that Gossett was charged with the crime of larceny, no logical reason appears why she chose to state that she was to keep him "free and clear from charges". Her conduct in this regard, even though it may have resulted from professional ineptitude, was not in keeping with the obligation imposed upon every lawyer to act with the utmost good faith toward his client and with highest loyalty and devotion to his client's interests.

### Prosperito Case.

The facts in regard to this charge are rather simple and undisputed. Mary Prosperito employed the respondent to represent her in a divorce action. She paid respondent a fee of $50 and advanced to respondent $29 for court costs. Both items were paid under an agreement that if respondent was able to collect the attorney's fee and costs from her client's husband, the payment would be returned to the client. In time the divorce was granted, and respondent was allowed a fee of $75 by the trial court. Respondent, by letter to one of the attorneys for the Bar Committee, written on September 2, 1954, admitted that she had collected $50 from the attorney who represented the husband. Other testimony would have indicated that the entire $75 had been paid to respondent. Out of the $29 deposited as court costs, $3.75 thereof was returned to respondent. No part of the $50 advanced by Mrs. Prosperito or the $3.75 refund on the filing fee was returned to respondent's client in accordance with the agreement until after the Bar Committee began its investigation of respondent's complaint. On September 2, 1954, respondent sent a $25 money order to Mr. Greve, one of the attorneys for informants, to be applied on the amount of her indebtedness to Mary Prosperito, and promised to pay the remaining $25 in "two more weeks". It seems rather obvious that, with respect to the Prosperito case, the conduct of respondent amounted to a misappropriation of her client's funds.

Before proceeding to the question of the disciplinary action that should be meted out, we deem it important that the background of respondent, as well as her physical condition at the time of the hearing before the Commissioner on October 18, 1955, be understood. She had been a lawyer since "about 1942". She attended the Cape Girardeau Teachers College, the University of Arizona, the Benton College of Law, and received her law degree from the Missouri Institute of Law and Accountancy. Her husband died in August, 1932, three months prior to the birth of her second child. She has a son aged twenty-five and a daughter aged twenty-three. Several prominent members of the bar of St. Louis were willing to appear as character witnesses and attest that in their dealings with Mrs. Speiser, they found her to be reliable, courteous, and competent. At the time of the hearing, respondent was being treated for a serious kidney infection. For many years she has had a heart ailment, and because of a tubercular condition from which she suffered at one time she went to the State of Arizona. It appears from the statement made by respond-

ent's counsel to the Commissioner that one of the prime factors motivating the desire to dispose of the matter without trial was respondent's ill health. The Commissioner, who had the opportunity of observing respondent, formed the opinion "that she is suffering from a nervous condition that in many instances verges on outright hysteria, to the extent that psychiatric treatment might be desirable".

Upon our findings, and in view of all the facts and circumstances, should respondent be publicly reprimanded as recommended by the Special Commissioner, her right and privilege to practice law suspended for a period of one year as recommended by informants, or should she be permanently disbarred? We approach this vital question sensible of certain basic principles applicable to proceedings of this character, which we reassert and reaffirm.

The power to disbar or suspend a member of the legal profession is not an arbitrary one to be exercised lightly, at pleasure, in hostility, or with either passion or prejudice. Courts approach the problem with a deep sense of responsibility, conscious that such power is to be used only in moderation, with sound discretion, and only in a clear case for weighty reasons and on clear proof. In re Conner (en Banc), 357 Mo. 270, 207 S.W.2d 492; In re Williams, 233 Mo.App. 1174, 128 S.W. 2d 1098; In re Mason, Mo.App., 203 S.W. 2d 750. A proceeding of this character is not designed or intended for the purpose of punishing the attorney. It is not a criminal proceeding, rather the purpose of the inquiry is to determine the fitness of an attorney to continue as such, "to deprive them (attorneys) of their previously acquired right to serve as officers of the court," and to protect the courts and the public. In re Richards (en Banc), 333 Mo. 907, 63 S.W.2d 672, 679; In re Spar-

row, 338 Mo. 203, 90 S.W.2d 401; In re Conner, supra.

Having profound respect for the ability and sincerity of the distinguished and conscientious Special Commissioner, it is with considerable reluctance that we refrain from adopting and following his recommendation. Although "professional ineptitude" may have been a contributing factor for the actions of respondent, the fact nevertheless remains, as herein demonstrated, that respondent failed to account to her client Mrs. Patterson for $318.56 and $116.40; and to her client Mrs. Prosperito for $53.75. That the sum of these items was converted by respondent to her own use is quite evident. The system for establishing and dispensing justice cannot be developed and maintained to a high point of efficiency so that the public shall have absolute confidence in the integrity and impartiality of its administration (Preamble to Canons of Ethics) if improper motives and conduct of members of the legal profession are to be tolerated or excused because of "professional ineptitude".

A review of the decisions of our courts discloses that in a majority of the cases involving misappropriation of funds of another, permanent disbarment has been ordered.[1] However, in the early case of In re Marshall, decided in 1913, 178 Mo.App. 16, 160 S.W. 531, suspension from practice for a period of one year was ordered, apparently because the court found there was no felonious intent at the time of the unlawful conversion of the client's money. And in the case of In re West, Mo.App., 148 S.W.2d 67, which involved failure to account for $100, a reprimand was administered. In the final analysis there is no hard and fast rule to be employed in determining whether an attorney found guilty of misconduct should

[1]. In re Buchanan, 28 Mo.App. 230; State Bar Committee v. Stumbaugh, Mo.Sup., 123 S.W.2d 51; In re Block, Mo.App., 136 S.W.2d 358; In re Lacy, 234 Mo. App. 71, 112 S.W.2d 594; In re Conner, 357 Mo. 270, 207 S.W.2d 492; In re Downs, Mo.App., 255 S.W.2d 834; In re Oliver, Mo.Sup., 285 S.W.2d 648.

be reprimanded, suspended from the practice for a definite time, or permanently disbarred. Each case must rest upon, and be determined according to, its own facts. In re Downs, 255 S.W.2d 834, loc. cit. 839. "The disciplinary action to be meted out in each case rests with the sound discretion of the court, and in reaching its decision it should consider all the facts and circumstances, keeping in mind at all times that disbarment should be resorted to only when no other action will suffice." In re Gardner, 232 Mo.App. 502, 521, 119 S.W. 2d 50, 61.

Having in mind that the Eighth Judicial Bar Committee is composed of able, conscientious, and prominent members of the profession who, as officers of the courts, are deeply conscious of the necessity of protecting the courts and the public from unscrupulous lawyers, we cannot pass lightly over the recommendation made by the Committee and its able counsel, although we are in no respect bound thereby. Those men gave unsparingly of their time in conducting a full and comprehensive investigation of the complaints, extending from February 6, 1953, until the filing of the information in this court on April 8, 1955, during the course of which they were afforded the opportunity to personally observe the interested parties. Based upon their intimate knowledge of the facts, and possessing a vital interest in the welfare of the legal profession, the courts, and the public, they reached the decision that suspension from practice for a period of one year would constitute effective disciplinary action.

While we do not believe a reprimand is sufficient or adequate under the circumstances, we are of the opinion that complete disbarment, "resorted to only when no other action will suffice", is unwarranted.

■ Accordingly, it is the judgment of this court that respondent should be suspended from the practice of law for a period of one year from this date, and

until satisfactory proof has been furnished that she has paid the following items: St. Elizabeth's Hospital, Belleville, Illinois, $116.40; Margaret Patterson, $318.56; and Mary Prosperito, $28.75; and until payment has been made by her of all costs taxed in this court, to wit, the sum of $1,-595.65.

It is so ordered.

ANDERSON, P. J., and RUDDY and MATTHES, JJ., concur.